F I L E D
Clerk
District Court

APR - 9 2003

For The Northern Mariana Islands
By_____
(Deputy Clerk)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN MARIANA ISLANDS

BONIFACIO VITUG SAGANA,                    )        Civil Action No. 01-0003
                                           )
                   Plaintiff,              )
                                           )
                                           )        ORDER DENYING PLAINTIFF'S
         v.                                )        MOTION FOR SUMMARY
                                           )        JUDGMENT[1] AND DISMISSING
JOAQUIN A. TENORIO, et al.,                )        CASE WITH PREJUDICE
                                           )
                   Defendants.             )
                                           )

Plaintiff Bonifacio Vitug Sagana (hereinafter "Sagana") moved the court for summary

judgment regarding paragraph 52 of his complaint.

## I.    STATEMENT OF THE CASE

On December 20, 2000, Sagana, a nonresident worker, filed a complaint and petition for

judicial review against Mark D. Zachares, Secretary of Department of Labor and Immigration,

---

[1]

   Sagana moved for a judgment as a matter of law pursuant to FED. R. CIV. P.
50(a)(1). However, the court had directed the parties to file cross motions for summary
judgment pursuant to FED. R. CIV. P. 56. *See* Amend. Order After Renewed Pretrial Conf.
¶ 3 (Oct. 2, 2002) and Order Setting Settle. Agreement Deadlines, Pldg. Sched., Page
Limits, and Taking Trial Off Calendar ¶ 2 (Oct. 3, 2002). Only Sagana filed a motion,
which was not the proper motion. However, the court will treat his motion as a motion for
summary judgment.

EXHIBIT " 1 '

and the Commonwealth of the Northern Mariana Islands (hereinafter "CNMI") Department of

Labor and Immigration (hereinafter "DOLI") in the Superior Court for the Commonwealth of the

Northern Mariana Islands. In his complaint, Sagana sought declaratory relief, injunctive relief,

monetary damages, and attorney fees against defendant Zachares, in his personal capacity and

official capacity as Secretary of DOLI, pursuant to 42 U.S.C. §§ 1983 and 1988.[2] Sagana also

sought judicial review of agency action against DOLI pursuant to 3 N. MAR. I. CODE § 4446 and

1 N. MAR. I. CODE § 9112.

On January 16, 2001, this matter was removed from the CNMI Superior Court to this

court pursuant to 28 U.S.C. § 1441(a). A case management conference was held on February

23, 2001, where this matter was set for a bench trial on December 10, 2001. After subsequent

motions to modify the case management scheduling order, the court ordered a new trial date of

October 7, 2002.

On September 30, 2002, a renewed pretrial conference was held where the parties agreed

to settle various aspects of the case. *See* Amend. Order After Renewed Pretrial Conf. ¶¶ 1-2

(Oct. 2, 2002). On October 2, 2002, a settlement hearing was held where, in the presence of the

court, the parties reviewed and discussed all the terms of their settlement agreement. On October

3, 2002, the court issued an order directing defendants to prepare the settlement agreement,

incorporating all substantive terms agreed to by the parties at the settlement hearing. *See* Order

Setting Settle. Agreement Deadlines, Pldg. Sched., Page Limits, and Taking Trial Off Calendar ¶

---

[2]

On October 2, 2002, the parties stipulated that Joaquin A. Tenorio shall be
substituted into the complaint, in his official capacity only, as the defendant to Sagana's
First Cause of Action. *See* Joint Stip. to Substitute Party and Order (Oct. 2, 2002).

1  1 (Oct. 3, 2002). The court further ordered that the issue of "whether the plaintiff has substantive

2  due process and equal protection rights to freely market his labor in the common occupations of

3  life to any prospective employer without restriction and on equal terms as any citizen for so long

4  a period as plaintiff is lawfully admitted to the CNMI as a nonresident worker" would be

5

6  submitted to the court in the form of Cross Motions for Summary Judgment. Id. at ¶ 2.

7      The parties' settlement agreement and stipulated judgment dated November 25, 2002,

8  was filed with the court on December 3, 2002.

9      **A.    The Settlement Agreement**

10      Pursuant to the Settlement Agreement, Sagana can pursue his claim against defendant

11

12  Tenorio, in his official capacity as Secretary of DOLI, for declaratory relief regarding the issue of

13  whether he has the right to freely market his labor. *See* Settle. Agreement ¶ 5 (Dec. 3, 2002).

14  This issue originally appeared in paragraph 52 of Sagana's Complaint, which was part of

15  Sagana's first cause of action. *See* Compl. ¶ 52 (Dec. 20, 2000). Paragraph 52 states:

16      Plaintiff claims [the] right to a declaration by this court that DOLI may not
17      restrict plaintiff's substantive due process and equal protection rights to
       freely market his labor in the common occupations of life to any prospective
18      employer without restriction and on the equal terms as any citizen for so
       long a period as plaintiff is lawfully admitted to the CNMI as a nonresident
19      worker.

20  Id. Sagana's first cause of action was against defendant Zachares, in his official capacity as

21

22  Secretary of DOLI, pursuant to 42 U.S.C. §§ 1983 and 1988 for declaratory relief, injunctive

23  relief, and attorney's fees. Id.

24

25

26

3

Sagana claims this right under three independent grounds: (1) 42 U.S.C. § 1981; (2) the Equal

Protection Clause of the Fourteenth Amendment; and (3) the Substantive Due Process under the

Fourteenth Amendment.

Defendant Tenorio opposed Sagana's motion for five reasons: (1) Sagana's arguments

were not raised in his complaint and, therefore, he cannot raise them now;[3] (2) the CNMI can

regulate aliens under the Nonresident Workers Act (hereinafter "NWA") because of its unique

authority to regulate its own immigration; (3) the proper standard of review for the CNMI's

immigration laws is a "rational basis" standard; (4) under the proper standard of review, the

CNMI has not committed a violation of the Equal Protection or Due Process Clauses of the

Fourteenth Amendment; and (5) significant policy reasons militate against Sagana's request.

**A.    42 U.S.C. § 1981[4]**

Sagana argued that the CNMI lacks legitimate power to deny him the rights the United

States has provided under 42 U.S.C. § 1981.  He argued that § 1981 preempts the CNMI's Non-

---

[3]

    Defendant Tenorio originally argued that Sagana did not properly raise alleged
violations of 42 U.S.C. § 1981 and the equal protection and due process clauses of the
Fourteenth Amendment. On February 13, 2003, Tenorio withdrew that argument, while
still maintaining his argument that Sagana did not properly raise his 42 U.S.C. § 1981
claim. *See* Mot. to Modify Def.'s Opposition to Pl.'s Mot. for Judm. as a Matter of Law
(Feb. 13, 2003).

[4]

    42 U.S.C. § 1981(a) states that:

    All persons within the jurisdiction of the United States shall have the same
    right in every State and Territory to make and enforce contracts, to sue, be
    parties, give evidence, and to the full and equal benefit of all laws and
    proceedings for the security of persons and property as is enjoyed by white
    citizens, and shall be subject to like punishment, pains, penalties, taxes,
    licenses, and exactions of every kind, and to no other.

5

1  Resident Workers Act because the Act, on its face, violates the rights of aliens under § 1981.

2  The NWA classifies on the basis of alienage by restricting the contract rights of nonresident

3  workers who are aliens, while U.S. citizens are generally free to contract and take any job(s) they

4  want.

5

6       Sagana further argued that the court should apply § 1981 to this case. He argued that the

7  Ninth Circuit "wrongly decided" Magana v. Commonwealth of the Northern Mariana Islands,

8  107 F.3d 1436, 1446-47 (9th Cir. 1997), when it held that § 1981 derives from the Civil Rights

9  Act of 1866 and only prohibits discrimination based on race. See Pl.'s Mot. for Judgment as a

10  Matter of Law p. 13:10 (Oct. 18, 2002). Sagana instead argued that § 1981 was enacted to

11  prohibit state-sponsored discrimination based on alienage. Sagana argued that the protections

12  offered by federal civil rights laws must be viewed against the events of the time, and that a

13  review of the historical events leading up to the enactment of § 1981 shows that this statute was

14  intended to prohibit state-sponsored discrimination based on alienage.

15

16       Tenorio argued that the only thing left to be litigated in this case is paragraph 52 of

17  Sagana's complaint and that paragraph does not mention the § 1981 violations that Sagana now

18  alleges. Tenorio also argued that the Ninth Circuit in Magana held only that § 1981 bars racial

19  discrimination, which Sagana concedes, but Sagana states is a wrong decision. Tenorio argued

20  that § 1981 is inapplicable because Sagana does not and cannot claim that the NWA is racially

21  discriminatory.

22

23       Defendant Tenorio's first argument is well taken, and the court need enquire no further.[5]

24

25        5

26       The court concludes that no discussion is necessary regarding Sagana's argument
                                   (continued...)

6

Nowhere in the first cause of action does Sagana mention 42 U.S.C. § 1981. In fact, the first cause of action was limited to 42 U.S.C. §§ 1983 and 1988. *See* Compl. ¶¶ 48-57. "A party need not plead specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case." American Timber & Trading v. First National Bank of Oregon, 690 F.2d 781, 786 (9th Cir. 1982). *See also* In re Acequia, Inc., 34 F.3d 800, 814 (9th Cir. 1994) (stating that "the main purpose of the complaint is to provide notice of what plaintiff's claim is and the grounds upon which the claim rests.... [T]he plaintiff must at least set forth enough details so as to provide defendant and the court with a fair idea of the basis of the complaint and the legal grounds claimed for recovery."). Sagana's motion does raise an argument that was not contemplated in the Settlement Agreement. Based on what was discussed at the renewed pretrial conference and the settlement hearing and what was memorialized in the Settlement Agreement, Sagana is only allowed to pursue his single claim against Dr. Tenorio, in his official capacity as Secretary of DOLI, for declaratory relief regarding the issue of whether he has the right to freely market his labor.

It was not the understanding of the court that Sagana would be arguing that certain sections of the NWA be declared void under 42 U.S.C. § 1981. More importantly, the single issue left for adjudication, memorialized as ¶ 5 of the Settlement Agreement, does not provide the defendant with any notice of the 42 U.S.C. § 1981 grounds upon which Sagana's claim now rests. The paragraph does not provide any hint that Sagana is alleging a violation of his civil

---

[5](...continued)
that the Ninth Circuit "wrongly decided" Magana and that § 1981 was really intended to prohibit state-sponsored discrimination based on alienage. The court is bound by *stare decisis* and may not overrule the Ninth Circuit.

7

CNMI does not have a compelling interest in discriminating against aliens in any form of private sector employment.

Sagana also argued that his substantive due process rights have been violated because the Fourteenth Amendment protects the liberty of all persons, including aliens, to work unrestricted and the NWA denies him this freedom.

Defendant Tenorio argued that the applicable standard for interpreting immigration laws under the U.S. Constitution is a "rational basis" standard[8] and that "strict scrutiny" only applies to the States. This is so because the States, unlike the CNMI, have no authority to implement their own immigration laws or to regulate the activities of aliens. This immigration power is usually reserved for the federal government. However, because the CNMI's authority over immigration is analogous to that of the federal government, "rational basis," or at the most, "intermediate scrutiny,"[9] should apply to challenges to the NWA. Tenorio argued that under either the rational basis or intermediate standards of review, the NWA does not violate the Equal Protection Clause because the provisions of the NWA are aimed at addressing legitimate CNMI government interests.

Tenorio further argued that Sagana does not have a viable substantive due process claim because the restraints DOLI places on Sagana's right to contract are reasonable and survive

---

[8]   A statute survives "rational basis" review if there is a rational relationship between the disparity of treatment and some legitimate government purpose. See Pennel v. City of San Jose, 485 U.S. 1 (1988).

[9]   A statute survives "intermediate" scrutiny if its application results in disparate treatment to a semi-suspect class and the statute is substantially related to important governmental interests. See Craig v. Boren, 429 U.S. 190 (1976).

9

judicial scrutiny.  Tenorio argued that the CNMI has important, legitimate interests in regulating

and tracking the activities of nonresident workers and in policing its borders.

The Ninth Circuit has held that "analysis of an equal protection claim alleging an

improper classification involves two steps." McLean v. Crabtree, 173 F.3d 1176, 1185 (9th Cir.

1999).  The plaintiff "must first show that the statute, either on its face or in the manner of its

enforcement, results in members of a certain group being treated differently from other persons

based on membership in that group.  Proof of discriminatory intent is required to show that state

action having a disparate impact violates the Equal Protection Clause.  Second, if it is

demonstrated that a cognizable class is treated differently, the court must analyze under the

appropriate level of scrutiny whether the distinction made between the groups is justified." Id.

(internal quotations and citations omitted).

The case at hand presents an additional analytical step. Before determining the

appropriate level of scrutiny for judicial review of the NWA, the court must first determine

whether the CNMI should be treated as a State when it comes to matters of immigration.

Clearly, it should not.  Pursuant to § 503(a) of the COVENANT, the CNMI, unlike a State, is not

generally subject to the immigration laws of the United States.[10]  The CNMI has the unique status

---

[10]

§ 503 of the COVENANT states:

The following laws of the United States, presently not applicable to the Trust
Territory of the Pacific Islands, will not apply to the Northern Mariana Islands
except in the manner and to the extent made applicable to them by the Congress
after termination of the Trusteeship Agreement:

(a) except as otherwise provided in Section 506, the immigration and
naturalization laws of the United States;....

10

of controlling its immigration. This is a power generally reserved for the federal government.

*See* United States v. Lopez-Flores, 63 F.3d 1468, 1473 (9th Cir. 1995) (noting that Congress has

plenary power to regulate immigration and naturalization under Art. I, Section 8, Clause 4 of the

Constitution). Therefore, there are three issues before the court:

    (1)    Does the NWA, either on its face or in the manner of its enforcement, result in alien workers being treated differently from non-alien workers based on membership in that group?

    (2)    Is the CNMI treated as a State when it comes to matters of immigration?

    (3)    What is the appropriate level of judicial scrutiny to apply to the NWA?

First, Issue One is disposed of because the policy statement of the NWA itself states that

the NWA is discriminatory in nature. The policy statement, codified at 4 N. MAR. I. CODE §

4411 (1999), states:

> (a) The legislature finds and declares that it is essential to a balanced and stable economy in the Commonwealth that residents be given preference in employment and that any necessary employment of nonresident workers in the Commonwealth not impair the wages and working conditions of resident workers.

> ...[T]he employment of nonresident workers should be temporary and generally limited to the duration of the specific job or employment for which the alien was recruited.

> (b) It is the intent of the amendments to the act to provide stricter enforcement, control and regulation of nonresident workers. It is further the intent of this act to require resident workers to be at least 10 percent of every employer's management, ... to prohibit the transfer of nonresident workers from one employer to another except as provided by law, to control the issuance of temporary work permits, to increase the job referral services provided to resident workers and to establish a four year maximum time period for nonresident worker[s] to remain in the Commonwealth.

11

Next, it is undisputed that the Fourteenth Amendment applies to the CNMI. *See* COVENANT § 501(a).

It is also undisputed that the CNMI is not generally subject to U.S. immigration laws. *See* COVENANT § 503(a).[*] What is disputed is the status of the CNMI when one of its statutes is challenged for violation of the Fourteenth Amendment's Equal Protection Clause. Should the CNMI be treated as a State or is its position in regards to immigration powers more akin to that of the federal government?

Just as the United States Congress can control the entry of aliens into the U.S.,[11] the CNMI legislature controls the entry and employment opportunities of aliens in the Commonwealth. *See* COVENANT §§ 105 and 501-03. Therefore, in enacting and enforcing the NWA, the CNMI essentially occupies the position of the federal government, in that it can enact and enforce its own immigration laws.[12] Accordingly, a look at the federal immigration laws

---

[11]

*See* <u>Kleindienst v. Mandel</u>, 408 U.S. 753, 765-67 (1972) (noting that Congress has plenary control over admission and exclusion of aliens) and <u>Oceanic Steam Navigation Co. v. Stranahan</u>, 214 U.S. 320, 339 (1909) (stating that "over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.").

[12]

Analogizing the federal immigration laws and the NWA may be considered a "stretch" in some courts. However, the Supreme Court and the Ninth Circuit has shown great deference to the CNMI when it has faced challenges to the COVENANT. *See, e.g.,* <u>Rayphand v. Sablan</u>, 95 F. Supp.2d 1133 (D.N. Mar. I. 1999), *aff'd sub nom.* <u>Torres v. Sablan</u>, 528 U.S. 1110 (2000) (three-judge panel of the district court held that the CNMI's malapportioned Senate did not violate equal protection because the "one person, one vote" doctrine is not a fundamental constitutional right guaranteed to residents of unincorporated territories); <u>Wabol v. Villacrusis</u>, 958 F.2d 1450, 1462 (9th Cir. 1992), *cert. denied,* 506 U.S. 1027 (1992) (holding that the land alienation restrictions of Article XII of the Commonwealth Constitution are not subject to equal protection attack); and <u>CNMI v. Atalig</u>, 723 F.2d 682, 690 (9th Cir. 1984), *cert. denied,* 467 U.S. 1244 (1984) (holding that CNMI statutory provisions which state that trial by jury is not required in any civil action

(continued...)

A0 72
(Rev. 8/82)

pertaining to the granting of alien work visas provides some guidance to the court in determining

the constitutionality of those parts of the NWA implicated by this motion.[13]

For example, a nonresident worker in the CNMI can be analogized to an H2-B temporary

worker in the United States. The United States Bureau of Citizenship and Immigration Services

(hereinafter "BCIS"), created under the Department of Homeland Security,[14] allows U.S.

employers to petition for skilled and unskilled alien workers to obtain visas to temporarily work

in the U.S. in positions for which qualified U.S. workers are not available. Bureau of Citizenship

and Immigration Services, *Employment Categories and Required Documentation*

<http://www.immigration.gov/graphics/services/tempbenefits/ecrd.htm> (accessed April 7,

2003). *See also* 8 U.S.C. § 1101(a)(15)(H)(ii)(b) (1997) (defining an H2-B temporary worker as

an alien having a "residence in a foreign country which he has no intention of abandoning who is

coming to the United States to perform other temporary service or labor if unemployed persons

performing such service or labor cannot be found in this country...."). The process of obtaining

an H2-B visa for a temporary alien worker is very similar to that of a nonresident worker under

---

[12](...continued)
or criminal prosecution based on local law except when required by local law, do not
violate either the Sixth or Fourteenth Amendments).

[13]

  *See* Immigration and Nationality Act, 66 Stat. 163 (1952) (codified as amended at 8
U.S.C. § 1101 *et seq.* (1997)).

[14]

  U.S. Department of Homeland Security, *Citizenship and Immigration Services:
Serving Visitors and New Citizens* <http://www.dhs.gov/dhspublic/display?theme=57>
(accessed April 7, 2003) ("The Department of Homeland Security (DHS) will administer
the nation's immigration laws on March 1[st] when the Immigration and Naturalization
Service becomes part of DHS. Through the Bureau of Citizenship and Immigration
Services (BCIS), DHS will continue the tradition of welcoming immigrants into the
country by administering services such as ... work authorization and other permits....").

AO 72
(Rev. 8/82)

the CNMI's NWA.  For example, the BCIS requires an H2-B petitioner to show that unemployed

persons capable of doing the job petitioned for cannot be found in the United States.  Id.  The

H2-B petitioner is also required to apply for a certification from the U.S. Department of Labor

certifying that "qualified persons in the United States are not available and that employment of

the beneficiary(ies) will not adversely affect wages and working conditions of workers in the

United States similarly employed...."  8 C.F.R. § 214.2(h)(3)(i) (2002).[15]  An employer who

needs foreign labor must first file an application for certification with the local public

employment office and include a copy of the job offer with the application.[16]  20 C.F.R. §§

655.201(a)(1) and (b)(1) (2002).  Upon receiving the application, the employment office refers to

---

[15]
    *See also* 8 C.F.R. §§ 214.2(h)(iii)–(v) (regulatory provisions for H2-B temporary
labor certification on Guam) and 20 C.F.R. §§ 655.200-655.215 (regulatory provisions for
H-2B temporary labor certification in nonagricultural occupations) (2002).

    The Attorney General of the United States is charged with determining whether the
entry of foreign workers meets this standard.  8 U.S.C. § 1184(c) (1997).  The Attorney
General has delegated this responsibility to the Commissioner of Immigration and
Naturalization (*see* 8 C.F.R. § 2.1 (2002)), who, in turn, relies on the Secretary of Labor for
the initial determinations.  8 C.F.R. § 214.2(h)(3) (2002).  The Secretary of Labor relies
upon the employment referral system established under the Wagner-Peyser Act (48 Stat.
113 (1933) (codified at 29 U.S.C. § 49 *et seq.* (1997))).  These are the current regulations,
although they may be amended due to the creation of the Department of Homeland
Security.  *See, e.g.,* U.S. Department of Homeland Security, *DHS Organization*
<http://www.dhs.gov/dhspublic/interapp/editorial/editorial_0086.xml> (accessed April 7,
2003) (stating that the Director of Citizenship and Immigration Services will report directly
to the Deputy Secretary of Homeland Security).

[16]
    *See also* 20 C.F.R. § 655.203(c) (2002) (stating that the employer must include
assurances that the job opportunity is open to all U.S. workers and that the employer will
continue to seek United States workers until the foreign workers have departed for the
employer's place of employment) and 20 C.F.R. § 655.202(a) (regulations require that
"each employer's job offer to U.S. workers must offer U.S. workers at least the same
benefits which the employer is offering, intends to offer, or will afford, to temporary
foreign workers.") (2002).

14

the employer any qualified U.S. workers who are registered in their system.  1 Immigr. Law and

Defense § 3:82 (Aug. 2002) (citing Department of Labor General Administration Letter No. 1-

95, *Procedures for H-2B Temporary Labor Certification in Nonagricultural Occupations*, 60

Fed. Reg. 7216-7219 (Feb. 7, 1995)).  The employer is also required to advertise the job vacancy

in a newspaper of general circulation for at least three consecutive days or in a professional or

trade publication.  Id.  The employer submits to the public employment office in writing the

results of its recruitment efforts, identifying each U.S. applicant for the job, and explaining the

job-related reasons for not hiring each U.S. worker.  Id.  The office then sends the application,

results of recruitment, their prevailing wage rate findings, and other appropriate information to

the regional office of the Employment and Training Administration (hereinafter "ETA").  Id.

"The ETA regional office reviews the application and the results of recruitment to determine

whether U.S. workers are available for the job and whether employment of the alien will

adversely affect wages and working conditions of U.S. workers similarly employed, and decides

whether to grant or deny the application."  Id.

Similarly, the NWA requires that residents be given preference in employment before a

job is open to a nonresident worker.  4 N. MAR. I. CODE § 4411 (1999).  When an employer has a

job vacancy, she is required to notify DOLI of the vacancy so that DOLI can inform citizens of

the job opportunity.  4 N. MAR. I. CODE § 4431 (1999).  If resident workers cannot be found to

fill the job, the job vacancy is then advertised in a public medium for 15 days.  4 N. MAR. I.

CODE § 4432 (1999).  If there is still no resident worker to fill the job after the expiration of the

15 day publication period, the Secretary of DOLI determines under what conditions and for what

period of time the employer shall be permitted to use a nonresident worker to fill the vacancy.  4

15

N. Mar. I. Code § 4433 (1999).

The policy behind BCIS's requirements for an H2-B temporary worker visa is that BCIS wants "to ensure that the admission of aliens to work [in the United States] on a temporary basis will not adversely affect the job opportunities, wages, or working conditions of U.S. workers." Bureau of Citizenship and Immigration Services, *Employment Categories and Required Documentation* <http://www.immigration.gov/graphics/services/tempbenefits/ecrd.htm> (accessed April 7, 2003). Likewise, the CNMI's policy concerning nonresidents is that the employment of "nonresident workers in the Commonwealth not impair the wages and working conditions of resident workers ... [and] should be temporary and generally limited to the duration of the specific job or employment for which the alien was recruited." *See supra* 4 N. Mar. I. Code § 4411. Basically, the statutory and regulatory framework of both the Immigration and Naturalization Act and the Nonresident Worker Act is to give preference to U.S. citizens over foreign workers for jobs that become available within the U.S. and the CNMI.[17]

---

[17]
Sagana argued that the NWA is a "labor" statute that should not be confused with "immigration" laws. Sagana is correct that the CNMI's labor and immigration laws are distinct and are codified separately in the N. Mar. I. Code. *See* 3 N. Mar. I. Code §§ 4411-4452 (Labor Code) and 4301-4382 (Immigration Code). However, it is through and because of its immigration power that the CNMI enacted the NWA and created the Department of Labor and Immigration to enforce the Act. The CNMI's labor and immigration laws are very much intertwined, such that one cannot stand without the other. In fact, pursuant to Executive Order 94-3 (effective Aug. 23, 1994), the CNMI's executive branch was reorganized, one result of which was that the Labor Division of the Department of Commerce and Labor was separated and a new department, the Department of Labor and Immigration, was created. *See* N. Mar. I. Code § 4421 Commission Comment: Executive Order 94-3, §§ 301(a) ("There is hereby established a Department of Labor and Immigration which shall have at its head a Secretary of Labor and Immigration."), 301(b) ("The Division of Labor and the Division of Employment Services are transferred from the Department of Commerce to the Department of Labor and Immigration.") and 301(c)(1)
(continued...)

Thus, based on the clear similarities between U.S. immigration policy, rules and regulations regarding H2-B temporary alien workers and the similar provisions of the NWA, and the fact that the CNMI holds a position analogous to the federal government when it comes to matters of immigration, it follows that the appropriate level of judicial scrutiny to apply to the NWA is a "rational basis" standard. *See* Mathews v. Diaz, 426 U.S. 67, 83-85 (1976) (upholding federal legislation that restricted certain aliens' eligibility for a medical insurance program because it was not "wholly irrational" and noting that the standard of scrutiny applied to state legislation does not govern judicial review of federal legislation involving alienage); Dillingham v. Immigration and Naturalization Service, 267 F.3d 996, 1005 (9th Cir. 2001) (stating that "because federal immigration matters is plenary, federal classifications differentiating between groups of aliens are subject to relaxed scrutiny. Such classifications will be held valid unless wholly irrational."); Aleman v. Glickman, 217 F.3d 1191, 1200 (9th Cir. 2000) (holding that federal statutory classification among aliens in the distribution of welfare benefits is subject to "rational basis" equal protection review); City of Chicago v. Shalala, 189 F.3d 598, 604-05 (7th Cir. 1999) (holding that a "rational basis" level of scrutiny should be applied to Congressional legislation of aliens' welfare benefits); McLean, 173 F.3d at 1186 n.11 (noting that federal laws that classify on the basis of alienage are subject to "rational basis" review because of the government's overriding national interests in immigration and foreign relations); and United States v. Lopez-Flores, 63 F.3d 1468, 1473 (9th Cir. 1995) (stating that judicial scrutiny of federal

---

[17](...continued)
("The office of Immigration and Naturalization is redesignated the Immigration Service and is transferred to the Department of Labor and Immigration as a division of that department.").

17

1    laws that classify on the basis of alienage receive "rational basis" review).

2        The challenged portion of the NWA survives "rational basis" review if there is a rational

3    relationship between the disparity of treatment between residents and aliens and some legitimate

4    government purpose.  Aleman, 217 F.3d at 1200 (citing Heller v. Doe, 509 U.S. 312, 319-20

5    (1993)).  "A statutory classification must be upheld against equal protection challenge if there is

6    any reasonably conceivable state of facts that could provide a rational basis for the

7

8    classification."  Aleman, 217 F.3d at 1201 (citation omitted).

9        Aliens allowed to enter the CNMI under the NWA enjoy a privilege, not a right.  The

10   privilege granted by the CNMI is greater than that provided by the federal government.  The

11

12   United States has an annual cap of 66,000 visas issued for H-2B workers (see 8 U.S.C. §

13   1184(g)(B) (1997)), whereas the CNMI has no cap on the number of alien workers allowed to

14   enter and work in the CNMI.[18]  In fact, in order to address the concern "that the number of

15   nonresident aliens in the CNMI has grown to the proportions a political, economic, and social

16   crisis,"[19] the CNMI Legislature passed Public Law 11-6, which, effective March 27, 1998, placed

17

18   a moratorium on the hiring of nonresident workers.  3 N. MAR. I CODE § 4601 (1999).

19   Permitting aliens who are in the CNMI under a valid work permit to obtain part-time and/or other

20        [18]

21            The most recent figures compiled by the CNMI Department of Commerce indicate
         that, as of 2001, there were more than 36,000 alien workers in the CNMI.  See CENTRAL
22       STATISTICS DIVISION, DEPARTMENT OF COMMERCE, 2001 CNMI STATISTICAL YEARBOOK
         p. 52 table 4.22 (2002) (indicating that a total of 36,320 work permits were issued to non-
23       U.S. citizens in calendar year 2001).

24        [19]

25            3 N. MAR. I CODE § 4601 Commission Comment: Pub. L. No.11-6, Section 1
         (1999) (stating also that "[t]he restricted labor pool created by this legislation is a departure
26       from the prior policy of the Commonwealth which allowed for very liberal importation of
         alien labor.").

18

1    jobs without restrictions will, in effect, take away jobs from U.S. citizens.  This potential

2    outcome is contrary to the purpose and policy of the NWA.

3        The court finds that the CNMI has a rational basis for enforcing the NWA because its

4    provisions which give job preference to citizens (3 N. MAR. I CODE § 4413) and require aliens to

5    obtain DOLI approval for any new employment contract (3 N. MAR. I CODE §§ 4434 and 4437),

6

7    while effectively limiting the number of job positions open to nonresident workers, are rationally

8    related to the CNMI's interests in preserving employment opportunities for its citizens and

9    promoting economic self-sufficiency.[20]

10       Furthermore, the NWA does not completely prevent nonresident workers from "working

11
     in the common occupations of life."  Instead, it places reasonable limitations on nonresident
12
     workers' ability to contract for employment while they are legally in the CNMI.  See, e.g., 3 N.
13

14   MAR. I. CODE § 4437(d) (1999) ("No employer or nonresident worker shall execute any contract,

15   make any other agreement, or change any existing contract,... regarding the employment of such

16   worker, without the approval of the chief....").  In fact, the Act does permit other employment

17

18   _____

         20
19
         In the United States, H-2B temporary workers are only allowed to work for the
20   employer who petitioned for their work visa.  See 8 C.F.R. § 274a.12(b)(9) (2002) ("An
     alien in [H-2B] status may be employed only by the petitioner through whom the status was
21   obtained.") and 8 C.F.R. § 214.1(e) (2002) ("A non-immigrant who is permitted to engage
     in employment may engage only in such employment as has been authorized.  Any
22   unauthorized employment by a non-immigrant constitutes a failure to maintain status
     within the meaning of section 241(a)(1)(C)(i) of the Act.").  However, the alien may obtain
23   a second job only after the second employer petitions for the alien, goes though the labor
     certification process, and gets final approval on her petition.  8 C.F.R. § 214.2(h)(2)(C)
24   (2002) ("If the beneficiary will perform nonagricultural services for, or receive training
     from, more than one employer, each employer must file a separate petition with the Service
25   Center that has jurisdiction over the area where the alien will perform services or receive
     training....").
26

                                              19

opportunities for nonresident workers. *See, e.g.,* 3 N. Mar. I. Code §§ 4437(e),[21] 4437(m),[22] and

4602(a)-(c).[23] While these provisions do not grant Sagana the specific relief he requests – a

declaration that he can freely market his labor to any employer without restrictions and on equal

terms as any citizen for so long a period as he is lawfully in the CNMI as a nonresident worker –

they do provide alien workers with a means of obtaining other employment while they are legally

in the CNMI.

The limitations placed on alien workers are reasonable and survive rational basis scrutiny

because the CNMI has legitimate interests in regulating and tracking the activities of its alien

workers. For instance, the CNMI government needs to know how many nonresident workers are

---

[21]

A nonresident worker may, in certain circumstances, obtain sub-contract work with another employer. 3 N. Mar. I. Code § 4437(e) (1999):

> A nonresident worker shall not be permitted to perform any services or labor within the Commonwealth for any employer other than the employer for whom the chief has approved an employment contract with such worker, nor may a nonresident worker perform any services or labor on a subcontract between the employer of record and any other employer, *except that the chief may approve such a subcontract between the employer for a particular job with a specified duration as part of the original employment contract....*

(Emphasis added).

[22]

A nonresident worker may, in certain circumstances, "...perform [] services or labor outside the employee's job classification; provided that such assignment is within the scope of employer's business, is not prohibited by statute, and it in the same occupational category...." 3 N. Mar. I. Code § 4437(m) (1999).

[23]

A nonresident worker may, in certain circumstances, transfer from one employer to another during the contract period and after the initial contract period, provided that no qualified resident worker is available to fill the position to be filled by the transferring worker and all other requirements of the NWA have been satisfied. 3 N. Mar. I. Code § 4602 (1999).

AO 72
(Rev. 8/82)

within its borders and how their numbers affect job opportunities for the resident workforce. The government also has to be able to gauge the nonresident workers' positive effect on Commonwealth society and the government tax base with the strain placed on medical, social, public works, and law enforcement resources. In addition, the CNMI has a rational basis for policing its borders, especially given the recent heightened security measures implemented in the United States and its Territories as to the entry and exiting of aliens. The NWA is rationally related to the CNMI's legitimate interest in maintaining accurate and timely documentation of all alien workers and their employers to ensure both the workers and employers' compliance with the Act. *See, e.g.,* 3 N. MAR. I. CODE §§ 4441-4446 (enforcement, hearing and review procedures) and 4447 (remedies and penalties) (1999).

The court concludes that the challenged provisions of the NWA are rationally related to the CNMI's legitimate interests of protecting employment opportunities, wages, and working conditions of United States citizens, promoting economic self-sufficiency, permitting employment opportunities of nonresident workers while protecting their rights, ensuring worker and employer compliance with the Act, and policing the borders of the CNMI. Accordingly, Sagana's motion for summary judgment based on a violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment is DENIED.

### C. Conclusion

For the abovementioned reasons, plaintiff Sagana's motion for summary judgment is DENIED. This disposes of the single issue left for the court to consider in the this case. Thus, there being nothing further for the court to consider regarding this matter, the case is DISMISSED with prejudice and JUDGMENT is entered in favor of defendant Tenorio.

21

1      Pursuant to paragraph 7 of the Settlement Agreement, the court retains jurisdiction over

2  this case for the purpose of enforcing the terms of the Settlement Agreement and for Orders in

3  Aid of Judgment.

4      IT IS SO ORDERED.

5      DATED this 9th day of April, 2003.

6

7

8

9                         _Alex R. Munson_

10                       ALEX R. MUNSON

                            Judge

AO 72
(Rev. 8/82)

# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BONIFACIO VITUG SAGANA,
                *Plaintiff-Appellant,*

v.

JOAQUIN A. TENORIO, in his official
capacity as Secretary of the
Department of Labor and
Immigration, Commonwealth of
the Northern Mariana Islands,
                *Defendant-Appellee.*

No. 03-15779

D.C. No.
CV-01-00003-ARM

OPINION

Appeal from the United States District Court
for the District of the Northern Mariana Islands
Alex R. Munson, Chief Judge, Presiding

Argued and Submitted
April 30, 2004—Northern Mariana Islands

Filed September 7, 2004

Before: Mary M. Schroeder, Chief Judge,
Alfred T. Goodwin, and J. Clifford Wallace, Circuit Judges.

Opinion by Judge Goodwin

12905

EXHIBIT " 5 "

# SUMMARY

## Individual Rights/Constitutional Rights

The court of appeals affirmed a judgment of the district court. The court held that the Commonwealth of the Northern Mariana Islands (CNMI), by limiting a nonresident alien's ability to seek and engage in employment as a condition for entry, does not violate that alien's constitutional rights under the Fourteenth Amendment.

Appellant Bonifacio Sagana filed a complaint in the Superior Court of the CNMI against appellee the CNMI Secretary of the Department of Labor and Immigration, challenging the CNMI's Nonresident Workers Act (NWA); the Secretary removed the case to the CNMI district court. Under the NWA, citizens were given a general preference for all jobs, employers who wished to hire nonresident workers had to first notify the CNMI Department of Labor, and nonresident workers could not use their presence in the CNMI to establish citizenship or residency. Sagana, who was ordered to leave the CNMI because he did not have a valid work status, argued that the NWA restricted his right to freely market his labor in violation of 42 U.S.C. § 1981 and the Fourteenth Amendment's equal protection and due process clauses. After the district court granted in part the Secretary's motion for summary judgment, the parties entered into a settlement agreement that reduced Sagana's case to a claim that he had a right to pursue and engage in work unrestricted by the rules and procedures of the NWA. The district court dismissed Sagana's § 1981 claim because of Sagana's failure to specifically mention § 1981 in the settlement agreement or in the complaint. In the alternative, the court stated that it would have been compelled by Ninth Circuit precedent to dismiss a § 1981 claim based on alienage discrimination. The district court granted summary judgment for the Secretary.

Sagana appealed.