# ATTORNEY GENERAL'S OPINION NO: 07-01

## In Re:  The CNMI's Rights Over its Submerged Lands

**QUESTION PRESENTED:** What rights does the Commonwealth of the Northern Mariana Islands ("CNMI" or "Commonwealth") retained over its abutting oceanic submerged lands after the adverse federal court decisions in *Northern Mariana Islands v. United States of America*, No. Civ.A. 99-0028, 2003 WL 22997235 (D.N.Mar.I. Aug. 7, 2003), *aff'd*, 399 F.3d 1057 (9th Cir. 2005), *cert denied*, 126 S.Ct. 1566 (2006).

**SHORT ANSWER:** The CNMI has unimpeded jurisdiction over its internal waters and underlying submerged lands.  The CNMI maintains traditional police powers in the three-mile wide territorial sea.  The CNMI is entitled to additional rights in its territorial sea and exclusive economic zone, though the specific extent of those rights must be clarified by, and vested though, an act of Congress.

### BACKGROUND:

The CNMI Department of Lands and Natural Resource's Division of Fish and Wildlife ("DFW") requested a legal opinion explaining the basis of its jurisdiction to enforce CNMI laws regulating fishing practices and equipment within the Commonwealth's near shore waters.  DFW's jurisdiction has been repeatedly questioned after the adverse decision in the CNMI's federal lawsuit challenging the United States' claim of rights to the CNMI's abutting submerged lands. (*Northern Mariana Islands v. United States of America*, No. Civ.A. 99-0028, 2003 WL 22997235 (D.N.Mar.I. Aug. 7, 2003), *aff'd*, 399 F.3d 1057 (9th Cir. 2005), *cert denied*, 126 S.Ct. 1566 (2006)).

The answer to whether a government needs title to property in order to regulate the fish or wildlife passing over it was best summarized by Oliver Wendell Holmes, the revered chief justice of the U.S. Supreme Court, when he stated: "To put the claim of the State [to exclusive regulation of wildlife] upon title is to lean upon a slender reed." *Missouri v. Holland*, 252 U.S. 416, 434, 40 S.Ct. 382, 384 (1920).  Though property ownership does not provide the basis for authority to regulate fish and wildlife, the persistent question as to the extent of the Commonwealth's rights over its oceanic submerged lands remains.  This opinion fully explains the Commonwealth's present rights to its submerged lands.

**ANALYSIS:**

On March 20, 2006 the U.S. Supreme Court issued its order denying the Commonwealth's request for review of the Ninth Circuit Court of Appeals' decision regarding the submerged lands surrounding the Northern Mariana Islands. *Northern Mariana Islands v. United States*, __ U.S. __, 126 S.Ct. 1566 (2006). As a result of that order, the Commonwealth could no longer claim absolute ownership of all adjacent submerged lands extending offshore to a 200-mile limit. The Supreme Court order – which makes the Ninth Circuit decision on the matter the final word – did not extinguish the Commonwealth's rights over the submerged lands as is often reported; rather, it finalized the Ninth Circuit's clarification of the respective interests of the Commonwealth and the United States in the contested submerged lands.

Relying on the precedence of the 'paramountcy cases', the Ninth Circuit decision affirmed the district court's conclusion that the federal government has a paramount interest in the control of the nation's territorial seas in the interests of defense and national security. *Northern Mariana Islands v. United States*, 399 F.3d 1057, 1061-62 (9th Cir. 2005) (hereinafter "*N.M.I. v. U.S.*"). The Ninth Circuit decision explains at length that the Commonwealth maintains rights to its adjacent submerged lands, which diminish – while the national rights increase – as the land in question moves further into the open sea. *Id.* Thus, while the Commonwealth maintains qualified rights to its submerged lands, its claim to sovereignty over these lands through the Commonwealth Submerged Lands Act and Marine Sovereignty Act was declared preempted by federal law. *Id.* at 1066.

The CNMI submerged lands litigation provided the irrefutable conclusion that the Commonwealth does not have exclusive and absolute right to all submerged lands extending out 200 miles. Since the extent of the Commonwealth's rights over its abutting submerged lands must be determined by an act of Congress, *N.M.I. v. U.S.*, at 1066, the Commonwealth's rights at this time cannot be stated with absolute precision. There is, however, well-settled federal law in regards to the allocation of rights to submerged lands that will guide the negotiations and final determination of the Commonwealth's rights.

The degree of a coastal state's authority over its submerged lands is apportioned in relation to three geographic zones: 1) those lands nearest the shore, or "internal submerged lands"; 2) the belt of submerged lands beyond the internal submerged lands and extending outward three miles, underlying the "territorial seas"; and, 3) those submerged lands beyond the three mile belt and extending to the reaches of the United States exclusive economic zone, occupying the area referred to as "the high seas". *United States v. Louisiana,* 394 U.S. 11, 22, 89 S.Ct. 773, 781 (1969). The Commonwealth's interests within these three geographic zones are discussed below.

1) Internal Submerged Lands

The greatest source of confusion regarding the Commonwealth's rights over its near shore submerged lands is rooted in the distinction between the 'shoreline' and the 'coastline'. While the term 'shoreline' denotes the low-water mark along the mainland, the term 'coastline' denotes the line of the outermost boundary of coastal features. *U.S. v.*

*Louisiana,* 363 U.S. 1, 66-67, 80 S.Ct. 961, 997-998 (1960). Recognized coastal features, which are part of a coastal states 'coastline,' include: bays and harbors, *U.S. v. Louisiana*, 105 S.Ct. 1074, 470 U.S. 93 (1985); channels and sounds, *U.S. v. Maine*, 105 S.Ct. 992, 469 U.S. 504 (1985); and fringing islands. *U.S. v. California*, 381 U.S. 139, 85 S.Ct. 1401 (1965). The paramountcy doctrine does not apply to the submerged lands underlying these coastal features, thus, the coastal state exercises complete dominion over these near shore submerged lands. *United States v. California*, 322 U.S. 19, 30-31, 67 S.Ct. 1658, 1664 (1947)(discussing *Pollard's Lessee v. Hagan*, 44 U.S. 212, 1845 WL 6003 (1845)). Therefore, all waters landward of the Commonwealth coastline are internal waters, and all submerged lands underlying those waters are held exclusively by the Commonwealth government in trust for the people of the Commonwealth.

The Ninth Circuit decision acknowledges that the paramountcy doctrine does not apply to the Commonwealth's internal submerged lands, *N.M.I. v. U.S.*, at 1062, and thus the internal submerged lands are not affected by the submerged lands decisions. While the district court opinion discusses features of internal waters in dictum,[1] the Ninth Circuit decision affirmatively states: "We express no opinion as to the specific contours of the boundaries of these waters and we do not read the district court's opinion as doing so, either." *N.M.I. v. U.S.* at 1067 (ftnt. 12). With the common understanding that near shore waters are held exclusively by the Commonwealth government, we shall turn our attention to determining more precise contours of the internal submerged lands underlying these waters.

The term 'internal submerged lands' is not defined in either the Submerged Lands Act, 43 U.S.C § 1301, *et seq.*, or the Territorial Submerged Lands Act, 48 U.S.C. § 1704, *et seq.,* though both Acts recognize that the rights of the United States begin seaward of inland waters. 43 U.S.C § 1301(c) and 48 U.S.C. § 1705(a) ("coastline" definition). The United States Supreme Court, in *United States v. California*, 381 U.S. 139, 85 S.Ct. 1401 (1965), established a standard for determining the location of the state owned inland submerged lands when it ruled that:

> "Congress, in passing the [Submerged Lands] Act, left the responsibility for defining inland waters to this Court. … It is our opinion that we best fill our responsibility of giving content to the words which Congress employed by adopting the best and most workable definitions available. The Convention on the Territorial Sea and the Contiguous Zone, approved by the Senate and ratified by the President, provides such definitions. We adopt them for purposes of the Submerged Lands Act. This establishes a single coastline for both the administration of the Submerged Lands Act and the conduct of our future international relations."
> 381 U.S. at 164-165, 85 S.Ct. at 1415-1416.

In this case, the Supreme Court was referring to what is now known as the First United

---

[1] *Northern Mariana Islands v. United States of America*, No. Civ.A. 99-0028, 2003 WL 22997235 (D.N.Mar.I. Aug. 7, 2003), at *19 and *20.

Nations Convention on the Territorial Sea and Contiguous Zone. UNCLOS I, *entered into force* September 10, 1964, 15 U.S.T. 1606, 1964 WL 70232 (hereinafter, "UNCLOS I" or "the Convention"). Since the ratification of UNCLOS I, there have been two additional international conventions regarding the law of the sea, culminating most recently in the 1994 treaty commonly referred to as the Law of the Sea Treaty[2] (hereinafter "UNCLOS III" or "the Law of the Sea"). While the later treaty refined the definitions in regards to the coastlines of island states, UNCLOS I is the unequivocal law of the land for establishing the boundaries of the United States coastline and internal submerged lands. *U.S. v. California,* 381 U.S. at 165, 85 S.Ct. at 1416.

The conceptual theme underlying the UNCLOS I definitions, and the court cases analyzing these definitions, is whether the free and direct travel of an internationally bound vessel could be impeded or restricted by a natural feature of a certain water body. If the answer to that query is 'yes', it is highly probable that the vessel has entered the 'internal water' of a coastal state.[3] While it would be an insurmountable task to provide

---

[2] The 1982 United States Convention on the Law of the Sea ("UNCLOS III" or "the Law of the Sea"), entered into force for all signing nations on November 16, 1994. UNCLOS III was approved by President Clinton and formally delivered to the U.S. Senate for advice and consent to ratify on October 7, 1994. S. TREATY DOC. NO. 103-39. Aside from provisions in Part XI of UNCLOS III, which were amended in 1994 upon the insistence of the United States, every successive administration since President Reagan has supported ratification of the Law of the Sea. *Accession to the 1982 Law of the Sea Convention and Ratification of the 1994 Agreement Amending Part XI of the Law of the Sea Convention (Senate Treaty Document 103-3: Senate Executive Report 108-10)* 108th Cong. (March 23, 2004)(Testimony of John F. Turner, Asst. Sec. of State, before Senate Environment and Public Works Committee). The Senate, however, has yet to act on this treaty proposal.

Within months of the conclusion of 1982 Convention on the Law of the Sea, President Reagan proclaimed United States sovereign rights and jurisdiction over the 200 mile exclusive economic zone bordering all U.S. waters, including those contiguous to the Commonwealth of the Northern Mariana Islands, in accordance with UNCLOS III. Proclamation No. 5030, 22 I.L.M. 461, 465 (March 10, 1983). The Presidential Proclamation was preceded by a policy statement wherein it is stated: "[T]he United States is prepared to accept and act in accordance with international law as reflected in the results of the Law of the Sea Convention." United States Ocean Policy, 22 I.L.M. 461, 462 (March 10, 1983).

Since UNCLOS III directly addresses the method of determining internal waters in island states, and since the United States has shown a consistent history of support for these definitions, the provisions of UNCLOS III are utilized for this analysis. Unlike the terms of UNCLOS I, however, the definitional terms of UNCLOS III are not controlling and should only be read as secondary authority.

[3] Caution must be given that United States Coast Guard maps and other aids to navigation were not designed to demarcate the boundaries of coastal state jurisdiction and, thus, can not be used as prima facie evidence of the delineation of inland waters. *U.S. v. Louisiana*, 394 U.S. 11, 35, 89 S.Ct. 773, 778 (1969) (*quoting,* 18 Fed.Reg. 7893 (1953)("The establishment of descriptive lines of demarcation is solely for purposes connected with navigation and shipping. … These lines are not for the purpose of defining Federal or State boundaries …")).

an exact description of the contours of the Commonwealth internal waters within this Opinion, broad categories of internal waters that are commonly found within the Commonwealth - with examples – are described below:

        a)        Fringing Reefs, Lagoons, and other Shallows

The vast majority of the Commonwealth coastline consists of coral reef complexes. As a general rule, all 'low tide elevations' – those reefs, shoals, and rocks that are uncovered at low tide – and all waters landward of the low tide elevations are included in a State's internal waters. *United States v. Louisiana*, 394 U.S. 11, 47, 89 S.Ct. 773, 793 (1969). This rule comes directly from Article 11 of the Convention:

> "A low-tide elevation is a naturally-formed area of land which is surrounded by and above water at low-tide but submerged at high tide. Where a low-tide elevation is situated wholly or partly at a distance not exceeding the breadth of the territorial sea from the mainland or an island, the low-water line on that elevation may be used as the baseline for measuring the breadth of the territorial sea."
> UNCLOS I, Art. 11 ¶ 1.

Under this rule, it is clear that large protected waters of the Commonwealth, such as the Saipan Lagoon, and the miles of coastline protected by visible coral reefs are all internal waters. This outcome conforms to the conceptual framework of the Convention – what we may call a mariner's rule of thumb – as a vessel traveling internationally would have to avoid all low tide elevations to continue unimpeded. Therefore, the submerged lands underlying these waters are exclusively held by the Commonwealth. *United States v. California*, 322 U.S. 19, 30, 67 S.Ct. 1658, 1664 (1947) (State exercises complete dominion over internal waters).

According to the mariner's rule of thumb, coastlines should also be avoided where coral reefs remain below the surface at low tide yet the shallow waters still pose a risk to travel. There is some support in the law that coastal waters that are too shallow for navigation, but 'navigable waters' in the legal sense, may also be included in a State's inventory of internal waters. In *United States v. California*, the Supreme Court cited Louisiana's Chandler and Brenton Sounds as examples of six to twelve foot deep waters that were found to be internal waters partly on the basis that they were too shallow to be readily navigable. 381 U.S. at 171, 85 S.Ct. at 1419. The latest revisions to the Law of the Sea, which are only secondary authority for this question, recognize that all waters landward of fringing reefs are internal waters of island states. UNCLOS III, Art. 6. Additional authority for the inclusion of all closely associated fringing reefs in the inventory of internal waters can be found in the analysis of a coastal state's historic bays, which is discussed below.

Therefore, there is absolute unquestionable authority that all waters and underlying submerged lands extending landward from the outer low tide mark of any exposed reef, shoal, or rock is included in the Commonwealth's inventory of internal submerged lands. UNCLOS III provides persuasive authority that all closely associated fringing reefs

should be included in the Commonwealth's inventory of internal waters.  The historic bay discussion, found below, provides solid primary authority for the recognition of the Commonwealth's shallow fringing reefs as internal waters.

        b)  Juridical Bays and Historic Bays

The Convention recognizes two types of coastal indentations that may be recognized as 'internal waters' of a coastal state: juridical bays and historic bays.  Juridical bays are cul-de-sac type indentations in a coastline that, when meeting specific criteria, are automatically included in a coastal state's inventory of internal waters.  Historic bays, as the name implies, are those that have been recognized over time as belonging to the coastal state.

To be recognized as a juridical bay, the Convention requires that the outline of the bay must be shaped like a semi-circle.  The semi-circle test, in full, is:

> "[A] bay is a well-marked indentation whose penetration is in such proportion to the width of its mouth as to contain landlocked waters and constitute more than a mere curvature of the coast.  An indentation shall not, however, be regarded as a bay unless its area is as large as, or larger than, that of the semi-circle whose diameter is a line drawn across the mouth of that indentation."
> UNCLOS I, Art. 7 ¶ 2.

Saipan's Laulau Bay and Rota's Sasanhaya Bay are examples of semi-circle shaped bays.  If a line were drawn across the natural entrance point of either bay, the resulting shape of the water body would be a semi-circle.  As such, both bays would be recognized under the Convention as juridical bays and internal water waters of the Commonwealth.  When that is the case, the Convention instructs:

> "If the distance between the low-water marks of the natural entrance points of a bay does not exceed twenty-four miles, a closing line may be drawn between these two low-water marks, and the waters enclosed thereby shall be considered as internal waters."
> UNCLOS I, Art. 7 ¶ 4.

Therefore, the semi-circle shaped bays in the Commonwealth, such as Saipan's Laulau Bay and Rota's Sasanhaya Bay, are unquestionably internal waters and fall within the exclusive dominion of the Commonwealth government.

The Convention also recognizes certain bodies of waters, referred to as 'historic bays,' that are so closely associated with a particular coastline that they must be included in a coastal state's internal waters. UNCLOS I, Art. 7, ¶ 6.  A 'historic bay' may be any shape and the term can be used interchangeably with 'historic inland waters.'  *United States v. Louisiana ("Alabama & Mississippi Boundary Case")* 470 U.S. 93, 102, 105 S.Ct. 1074, 1080 (1985).  Being that all waters located landward of low-tide elevations – those reefs,

shoals, and rocks exposed at low tide – are 'inland waters' according to the Convention, UNCLOS I, Art. 11, ¶ 1, the following discussion regarding historic bays pertain only to those waters overlying near-shore shallow reefs seaward of low-tide elevations. Examples of these shallow reefs include the lengths of coastline on the northwest side of Tinian, which have no exposed reef even at low tide, and the abundant coral complexes located seaward of the reef flat at Saipan's Obyan Beach.

Although the off-shore extent of historic internal waters may extend beyond waters ten fathoms (sixty feet) deep, this opinion limits its analysis to waters up to ten fathoms[4] as these waters are unquestionably historic internal waters, as set forth below. Because the Mariana Archipelago is bordered on both sides by a trough, without any continental shelf, depths of ten fathoms are normally reached within no more than one-quarter mile (1320 feet) from any low-tide elevation or exposed shoreline. The recognition of these shallow coastal waters as historic internal waters also fits within the overall framework of the Convention – the mariner's rule of thumb – since internationally bound vessels could not pass unaided within one-quarter mile of any Mariana Island shore without risk of running aground on an unseen shallow.

While the term 'historic bay' is not defined by the Convention, the Supreme Court has stated that a historic bay is a body of water "over which a coastal nation has traditionally asserted and maintained dominion with the acquiescence of foreign nations." *United States v. California*, 381 U.S. 139, 172, 85 S.Ct. 1401, 1419 (1965). The CNMI formally asserted dominion over its internal waters through the Marine Sovereignty Act of 1980, 2 C.M.C. § 1101, *et seq.*, by claiming all waters that "surround each island or group of islands, including any reef system, lagoon, or bay." 2 C.M.C. § 1122. The Commonwealth's assertion of dominion over its internal waters is not challenged by the international community.

Recognizing that an international standard is being used for the resolution of domestic disputes, the Supreme Court has clarified that "actions of local governments, if not repudiated by or inimical to the interests of the national sovereign, are assertions of dominion as against other nations." *United States v. Louisiana ("Louisiana Boundary Case"),* 394 U.S. 11, at 76, n. 103, 89 S.Ct. 773, 809 (1969). Aside from the Marine Sovereignty Act, the Commonwealth government has repeatedly asserted dominion over its coastal waters to protect a primary food source for its people. The Fair Fishing Act most clearly evidences the Commonwealth's assertion of exclusive control over all coastal waters to the depth of at least ten fathoms. 2 C.M.C. § 5631, *et seq.* By prohibiting all non-traditional fishing methods in coastal waters, *Id.*, fishing grounds are limited to waters that may be reached without the use artificial breathing assistance – approximately ten fathoms – and harvests are limited to what can be collected using traditional skills. This restriction not only provides food for families, it allows the citizens of the Commonwealth to oversee and act as stewards of their resources. *Id.*

---

[4] There are arguments for and against the inclusion of waters at depths greater than ten fathoms in the Commonwealth's inventory of internal waters. However, this opinion limits its discussions to this depth since ten fathoms nears the limits that a person can spearfish using traditional methods (unassisted by artificial breathing devices). Therefore, historic usage of waters to ten fathoms is unquestionable.

(Commission Comment, § 2). The asserted dominion over the near-shore waters is clear, unchallenged, and does not harm national interests; therefore, the Commonwealth has made a clear showing of historic title to its near-shore waters to a depth of ten fathoms.

In the *Alabama & Mississippi Boundary Case,* the Supreme Court stated that a coastal state's claim to a historic bay can be fortified by a showing of the usage of the near shore waters over time. *United States v. Louisiana,* 470 U.S. 93, 106, 105 S.Ct. 1074, 1082 (1985). The near shore coastal waters of the Commonwealth, to the depths of ten fathoms, have been utilized for centuries. These waters not only provide a primary source of food protein and supply items for local commerce and trade, the waters are also inextricably linked to the historical and cultural identity of the people of the Northern Marianas. The traditional recognition that the near shore water to a depth of at least ten fathoms is so closely linked to the geographic configuration, economic interests, and community cohesiveness that it is vitally important to the Commonwealth. As such, these near shore waters cannot be severed from the island geography and confirms that the Commonwealth has valid claim to historic title of near-shore waters to the depth of ten fathoms.

Therefore, the Commonwealth maintains title over all permanently submerged lands to a depth of ten fathoms (sixty feet), as historic bays, through the continual use and assertion of dominion over the submerged lands and overlying waters and resources.

                        c)        Protected Harbors

Each of the Commonwealth harbors is located landward of exposed coral reefs and within waters that are less than ten fathoms deep; therefore they are already included within the Commonwealth's inventory of exclusively held internal waters. However, the Convention also provides a separate article for the inclusion of harbors as internal waters:

> "[T]he outermost permanent harbour works which form an integral part of the harbour system shall be regarded as forming part of the coast."
> UNCLOS I, Article 8.

The Supreme Court has noted that the permanent structures protecting the harbor may be man made or naturally formed. *Louisiana Boundary Case,* 394 U.S. 11, 51, 89 S.Ct. 773, 796 (1969). In fact, it has been noted that this particular authorization for inclusion as an internal water was made without qualification. *United States v. California*, 381 U.S. 139, 175, 85 S.Ct. 1401, 1421(1965). Therefore, the marinas and harbors of the Commonwealth, to the extent of the outermost permanent feature of each, must be included in the Commonwealth's inventory of internal waters.

It must be noted that the Convention also addresses open roadsteads, such as the area where the pre-position ships anchor off the coast of Saipan. These areas are to be included in the territorial sea, UNCLOS I, Art. 9, and "[b]y implication, they are not to be considered inland waters." *United States v. California*, 381 U.S. at 175, 85 S.Ct. at 1421. Therefore, the area outside Saipan's Lagoon and other similarly situated deep-water open

anchorages may not be included in the Commonwealth's inventory of internal waters.

### d) Inter-Island Channels

The Marine Sovereignty Act specifically claims as internal waters of the Commonwealth "[t]he waters between Tinian and Aguiguan and between Tinian and Saipan." 2 C.M.C. § 1122. In the *Alabama & Mississippi Boundary Case*, the Supreme Court explains at length the policy of the United States to enclose as inland waters all islands "that were so closely grouped that no entrance exceeded 10 geographic miles." 470 U.S. 93, 107, 105 S.Ct. 1074, 1082 (1985). Being that the United States has consistently maintained this adopted policy in domestic and international relations, it remains bound to this official position in regards to disputes over submerged lands. *Id.*, 470 U.S. at 110, 105 S.Ct. at 1084. Therefore, the waters between Tinian and Aguiguan and between Tinian and Saipan are included within the inventory of the Commonwealth's internal waters.

Wherefore, the inventory of the Commonwealth's internal waters – and underlying submerged lands – include:   1) all waters landward of any low-tide elevations, which specifically include the Saipan Lagoon and all waters between the shoreline and any reef outcropping exposed at low tide, UNCLOS I, Art. 11 ¶ 1; 2) all semi-circle shaped bays, which specifically include Laulau Bay and Sasanhaya Bay, UNCLOS I, Art. 7 ¶ 2; 3) all historic inland waters measured to a depth of ten fathoms (sixty feet), which includes all shallow waters seaward of low-tide elevations and exposed coastlines, UNCLOS I, Art. 7, ¶ 6;   4) all protected harbors measured to the outermost man-made or natural permanent feature, which specifically include Rota's East and West Harbors, Tinian Harbor, and Saipan's marina and port system, UNCLOS I, Article 8;  and 5) both Saipan Channel and Tinian Channel. *Alabama & Mississippi Boundary Case*, 470 U.S. 93, 105 S.Ct. 1074 (1985). As internal waters, the Commonwealth exercises complete dominion over these waters and associated submerged lands for the benefit of its citizens. *United States v. California*, 322 U.S. 19, 67 S.Ct. 1658 (1947).

### 2) Territorial or Marginal Sea

International law recognizes that a nation may exercise sovereignty and jurisdiction over a territorial sea in order to forbid non-innocent passage of vessels near a nation's coastline[5]. UNCLOS I, Art. 16, ¶ 1; UNCLOS III, Art. 25, ¶ 1.  The United States

---

[5] The law of the sea recognizes that nations may delineate coastlines by claiming coastal features and configurations or by declaring straight baselines and publishing them for recognition by the international community. UNCLOS I, Art. 4, ¶ 1; and UNCLOS III, Art. 7, ¶ 1. The Marine Sovereignty Act adopted a straight baseline method for the demarcation the Commonwealth coastline. 2 C.M.C. § 1123. Since national defense and security is the purpose of the establishment of a territorial sea, "the choice under the Convention to use the straight baseline method for determining inland waters claimed against other nations is one that rests with the Federal Government, and not with the individual States." *United States v. California*, 381 U.S. 139, 168, 85 S.Ct. 1401, 1417 (1965). The United States has consistently chosen to delineate its

formally claimed a three-mile wide marginal belt as its territorial sea in 1793. *United States v. California*, 322 U.S. 19, 32 at ftnt 16, 67 S.Ct. 1658, 1665 (1947). While the United States historically maintained dominion over its territorial sea, the states have always been authorized to exercise local police power functions within the marginal belt. *Id.*, 322 U.S. at 36, 67 S.Ct. at 1667.

Congress passed the Submerged Lands Act in 1953, which transferred title over all lands and natural resources underlying the territorial sea to the individual coastal states. 43 U.S.C. § 1311. Following the closing of the Third Convention on the Law of the Sea, the United States extended its territorial sea to twelve nautical miles beyond its coastline. Proclamation No. 5928, 3 C.F.R. 547 (1988), *reprinted in* 43 U.S.C.A. 1331. The subsequent expansion of United States territorial sea has had no effect on any state's rights over their individual claims to submerged lands. *United States v. Alaska*, 521 U.S. 1, 9-10, 117 S.Ct. 1888, 1894 (1997).

Congress has similarly transferred title to the three-mile marginal sea surrounding the territories of Guam, Virgin Islands, and American Samoa. 48 U.S.C. § 1705. Until such time as Congress acts to provide the Commonwealth with title to the land underlying its marginal sea, the Commonwealth's interest in these submerged lands will remain inferior to the federal rights. *N.M.I. v United States*, 399 F.3d 1057, 1065-66 (9th Cir. 2005).

Wherefore, in the absence of a Congressional act transferring title to these submerged lands, the Commonwealth: 1) retains its local police powers within the three-mile marginal belt surrounding each of its islands, *United States v. California*, 322 U.S. 19, 36, 67 S.Ct. 1658, 1667; and 2) holds an executory interest in the ownership of a three-mile marginal belt surrounding each of the Mariana Islands. *N.M.I. v United States*, 399 F.3d 1057, 1065-66 ("the CNMI is entitled to the same interest in the seaward submerged lands as that of the states when they submitted to the sovereignty of the United States").

3)      High Seas

In 1953, Congress passed the Outer Continental Shelf Lands Act which declared ownership of "all submerged lands lying seaward and outside of [the territorial sea], and of which the subsoil and seabed appertain to the United States." 43 U.S.C. § 1331(a). After the closing of the Third Convention on the Law of the Sea, President Reagan proclaimed that United States' sovereign rights over these submerged lands extended 200 nautical miles beyond the coasts of the United States. Proclamation 5030 (March 10, 1983), 22 I.L.M. 461. President Reagan's exercise of sovereignty and jurisdiction included a claim to the submerged lands and waters within the exclusive economic zone surrounding the Northern Mariana Islands. *Id.* at 465.

---

coastline by delineation around coastal features and configurations, rather than use the straight baseline method. *See e.g.*, *Id.*; *Louisiana Boundary Case*, 394 U.S., at 72-73, 89 S.Ct., at 806-807; *Alabama & Mississippi Boundary Case*, 470 U.S. 93, 99, 105 S.Ct. 1074, 1078.

While the United States holds exclusive title over the submerged lands extending from its territorial seas to the reaches of its exclusive economic zones, the Outer Continental Shelf Lands Act declares that the civil and criminal laws of each adjacent State, which are not inconsistent with other Federal laws and regulations, are the laws of the United States' high seas. 43 U.S.C. § 1333(a)(2)(A).  However, the provisions of the Outer Continental Shelf Lands Act do not apply to United States territories and insular possessions. 43 U.S.C. § 1301(g)("The term 'State' means any State of the Union.").

The Territorial Submerged Lands Act, 48 U.S.C. § 1704, *et seq.*, is completely silent in regard to the respective exclusive economic zones of Guam, the Virgin Islands, and American Samoa.  Thus, these jurisdictions enjoy no rights over their respective exclusive economic zones.

As recognized in the Marine Sovereignty Act, the people of the Northern Mariana Islands have traditionally been a seafaring people and are dependant on the resources of the sea for their economic, social, and political survival and growth. 2 C.M.C. § 1111(a) and (b). In order to properly conserve, protect, and manage the resources located within the Commonwealth's adjacent exclusive economic zone – and maintain equal-footing with the various states of the union – the Commonwealth requires legal authority over the high seas located in its adjacent exclusive economic zone.

Wherefore, the Commonwealth presently retains no rights whatsoever in the exclusive economic zone surrounding the archipelago, which was claimed by the United States in 1983.  Any act of Congress granting the Commonwealth title and exclusive regulatory authority over its territorial sea must also include provisions that recognize the concurrent civil and criminal jurisdiction of the Commonwealth over the exclusive economic zone.

## CONCLUSION

For all the foregoing reasons, it is the opinion of the Attorney General that the Commonwealth of the Northern Mariana Islands has exclusive authority over its internal waters, as described herein.  The Commonwealth retains the authority to exercise its police powers within the three-mile wide territorial sea extending seaward from its internal waters.  And, presently, the Commonwealth retains no authority over the exclusive economic zone surrounding the archipelago.


Dated:  April ____, 2007                           _____
                                                    MATTHEW T. GREGORY