MATTHEW T. GREGORY  # F0205
Attorney General
GREGORY BAKA  # F0199
Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL
Hon. Juan A. Sablan Memorial Bldg., 2nd Fl.
Caller Box 10007, Capital Hill
Saipan, MP  96950-8907
Telephone:    (670) 664-2341
Fax:               (670) 664-2349
E-mail:          gbaka79@yahoo.com

Attorneys for Defendants Antonio Sablan,
Mel Grey, and Richard T. Lizama

UNITED STATES DISTRICT COURT

FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| AUTO MARINE, INC., ROLANDO SENORAN, BENJAMIN T. SANTOS, AUGUSTO SANTOS and NORMANDY SANTOS,<br><br>            Plaintiffs,<br><br>    vs.<br><br>ANTONIO SABLAN, MEL GREY in his official capacity as Acting Director of Immigration, and RICHARD T. LIZAMA, personally and in his official capacity,<br><br>            Defendants. | CIVIL ACTION NO. 05-0042<br><br>**DEFENDANTS' FIRST TRIAL MEMORANDUM; CERTIFICATE OF SERVICE**<br><br>Bench<br>  Trial:    Monday, 17 September 2007<br>Time:    9:00 a.m.<br>Judge:   Hon. Alex R. Munson |

    **COME NOW** the Defendants, through their counsel the Commonwealth of the Northern Mariana Islands (CNMI) Office of the Attorney General, and submit their First Trial Memorandum as follows.

1  Defendants continue to contend that they are entitled to judgment as a matter of law,
2  that is, that this case should be dismissed, for the reasons set forth in their Motion to
3  Dismiss (MTD) the First and Second Claims for Relief of the Amended Complaint
4  pursuant to Federal Rule of Civil Procedure 12(b)(6) filed on 24 May 2007, and their
5  Reply in support of the MTD filed on 12 July 2007.

6  Plaintiffs' First and Second Claims for Relief fail to state a claim for relief to the
7  extent they contest the validity of Title 3, Commonwealth Code, Subsection 4434(e)(1),
8  which provides as follows:

> **§ 4434.     Procedure and Requirements: Approval of Contract by Director.**
>
> After entering into a nonresident employment agreement pursuant to 3 CMC § 4433, ***an employer may use a nonresident worker*** to fill the job vacancy covered by this agreement, ***subject to the following procedures and conditions***:
>
> * * * *
>
> (e)   (1)  The Director of Labor shall not approve nonresident worker certificates for the following job classifications: taxi cab driver, secretary, bookkeeper, accounting clerk, messenger, receptionist, surface tour boat operator, bus driver, including tour bus driver, and telephone switchboard operator.

3 CMC § 4434(e)(1) (2004) (emphasis added).  *See* Amended Complaint ¶ 48.

## I. CONTRACTS CANNOT CONDONE EMPLOYMENT AS A "SURFACE TOUR BOAT OPERATOR"

In denying the Defendants' MTD, this Court, after quoting Title 3, Commonwealth Code, Subsection 4434(e)(1) without the first sentence of the entire section, concluded:

> Accordingly, this section mandates that the Director of Labor shall not approve certain nonresident worker certificates and does not create any liability or responsibility on the part of the plaintiffs.  The fact that the Director of Labor may have approved certain nonresident worker certificates in defiance of this section should not make the plaintiffs liable or responsible for the actions of the Director of Labor.  Thus, the facts as stated in the complaint support the plaintiffs' entitlement to relief.  The defendants' motion to dismiss is DENIED.

Order Denying Motion to Dismiss at 2, lines 6-11.

The issue was raised for the first time during oral argument that the approval by the CNMI Director of Labor, who is not a party to this litigation, of the employment contracts of Plaintiffs — Rolando Senoran as a "diving manager," Amended Complaint ¶¶ 23, 49; Benjamin Santos as a "manager" expressly allowed to operate or drive a boat as necessary, Amended Complaint ¶¶ 30, 50; Normandy Santos as a "water transportation engineer," Amended Complaint ¶¶ 36, 52; and Agusto Santos as a "helper mechanic" expressly allowed to operate or drive a boat as necessary, Amended Complaint ¶¶ 43-44, 51 — somehow insulate them from liability for working as a "surface tour boat operator" in violation of 3 CMC § 4434(e)(1) or create a question of fact as to estoppel against the CNMI Government.

However, the first sentence of Section 4434 incorporates all subsequent subsections as conditions on the employer (Auto Marine, Inc.) in the contractual relationship. *See supra* at 2, lines 10-11. Even before reaching the absolute bar to surface tour boat operator employment in Subsection (e)(1), the very first subsection of the same section of the Commonwealth Code, at Subsection 4434(a), concludes:

> Approval by the chief, as required by this section, is a review of the contract for compliance with the provisions of this chapter.  Such review shall not subject the chief or the Commonwealth government to liability on the employment contract, even if the chief approves a contract which does not comply with all the provision [sic] of this chapter.

3 CMC § 4434(a); Alien Labor Act of 1986, Pub. L. 5-32, § 8(a).

Also, a few sections later, employees are barred from employment except ***pursuant to*** an approved contract, 3 CMC § 4437(d) (emphasis added); and unlawful employment by an employer is a felony, 3 CMC § 4361(e), and by an employee a

3

misdemeanor or cause for deportation.  3 CMC § 4361(f).  *See generally Commonwealth v. Francisco*, Crim. No. 99-0055 (N.M.I. Super. Ct. Dec. 14, 1999) (attached).[1]

## II.  ESTOPPEL

Moreover, estoppel is an equitable doctrine invoked to avoid injustice in particular cases but rarely applied against the government.  In the leading case of *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51 (1984), the Court refused to invoke estoppel against the government so as to prevent recoupment of an overpayment made to a health care provider who had relied on oral representations by an official that certain costs were reimbursable.  The Court stated: "When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined.  It is for this reason that it is well established that the Government may not be estopped on the same terms as any other litigant."  467 U.S. at 60.

This doctrine has also been adopted as a matter of CNMI law.  In *Rasa v. Department of Lands and Resources, Division of Public Lands*, 1998 MP 7, 5 N.M.I. 162, the CNMI Supreme Court rejected a claim for specific performance of a land exchange agreement previously made by Commonwealth officials and former Governor Guerrero.  The Department of Public Lands and the Department of Public Works both indicated that there was no public purpose justifying the acquisition of the Rasa property. 1998 MP 7, ¶8.  "Estoppel is available when the actions of the government or its representative rise to

---

[1] The deportation cases against Plaintiffs Rolando Senoran, Benjamin Santos, Normandy Santos, and Agusto Santos, Amended Complaint ¶ 53, have been dismissed pursuant to the settlement of the Third through Sixth Causes of Action. The prosecution of Auto Marine President Adonis Santos, *see* Amended Complaint ¶¶ 54-55, has been stayed pending resolution of this case.

4

a level of 'affirmative misconduct' and will not be invoked where it would defeat operation of policy adopted to protect the public. Estoppel is rarely invoked for the negligence or omissions of a public official, unless the party seeking estoppel establishes affirmative misconduct beyond mere negligence." *Id*. at ¶11.

In addition to requiring a showing of affirmative misconduct, the Ninth Circuit has held that "even then, estoppel will only apply when the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability." *Watkins v. U. S. Army*, 875 F.2d 699, 707 (9th Cir.1989).

This general rule is a well recognized one of long standing. In *Utah Power & Light Co. v. United States*, 243 U.S.389 (1917), the Supreme Court rejected the power company's claim that the federal government was estopped from questioning the company's right to use public land in forest reservations as sites for generating electric power. To the extent that the company contended that its construction and operations of facilities were based on understandings and agreements with federal officials, the Court held that "the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." 243 U.S. at 409. To the argument that the company's activities had been known to government officials and "impliedly acquiesced therein," the Supreme Court responded: "This ground also must fail. As a general rule, laches or neglect of duty on the part of officers of the government is no defense to a suit by it to enforce a public right or protect a public interest." *Id*.

In a more recent case, a federal district court confirmed the right of federal officials to enforce a regulation issued by the National Park Service after many years of non-enforcement. *Washington Tour Guides Association v. National Park Service*, 808 F. Supp. 877 (D.D.C. 1992). The court held that the operators of tourist services in

Washington D.C. did not have a constitutionally protected right to solicit business on National Park Service grounds in violation of regulations outlawing that activity, even though they may have been allowed to do so for a number of years.  Relying on the *Utah Power & Light Company* decision, the court held that the doctrine of equitable estoppel is inapplicable even if the Park officials made the representations claimed by the plaintiffs: "Simply put, the government may not be estopped from enforcing the law, even following an extended period of no enforcement or underenforcement."  808 F. Supp. at 882.  Quoting from an earlier decision, the court stated: "An administrative agency charged with protecting the public interest is not precluded from taking appropriate action nor can the principles of equitable estoppel be applied to deprive the public of the statute's protection because of mistaken action or lack of action on the part of public officials."  *Id.*

### III. WHAT IS A "SURFACE TOUR BOAT OPERATOR"?

It seems the only remaining reason for this trial is to determine what is a "surface tour boat operator."  Title 3, Commonwealth Code, Subsection 4434(e) was added by the Alien Labor Act of 1986, Pub. L. 5-32, § 8(e), and does not define "surface tour boat operator."

During oral argument on Defendants' MTD, Plaintiff introduced arguments about international cruise ships piloted by alien captains being subject solely to U.S. Coast Guard regulation.  Defendants countered that these were ships, not boats.  Also, there are separate provisions dealing with vessel and aircraft crew entering the Commonwealth.  *See, e.g.,* 3 CMC § 4321(e).  The case at bar involves persons admitted to the CNMI admitted as permanent employees under the Nonresident Workers Act, 3 CMC §§ 4411-52, not alien crew members on brief sojourns.

Similar arguments could be made about the commercial fishing vessels that formerly landed at Tinian several decades ago being permitted entry solely by virtue of the U.S.C.G., though there is no gainsaying that the crew of such voyages were fishermen rather than tourists, and likewise covered by CNMI immigration law with respect to crew members.

At trial Plaintiffs are expected to introduce evidence that the Saipan-Tinian ferry has been operated by aliens.  The relevance of such evidence, however, is lacking, because such ferry voyages constitute point-to-point passenger and cargo transportation rather than the operation of a "surface tour boat."

In contrast to the surface tour boat operations to Mañagaha, where all or almost all trips are sold on a round-trip basis, the Tinian ferry sells one-way tickets, and there are other modes of return travel, such as by air.

This leads to the key word in the definition of a "surface tour boat operator," the word "tour."  Merriam-Webster's Online Dictionary defines the word in relevant part as follows:

> Etymology: Middle English, from Anglo-French tur, tourn turning, circuit, journey — more at TURN
>
> 2a:  a journey for business, pleasure, or education often involving a series of stops and ending at the starting point; also: something resembling such a tour <a tour of the history of philosophy> b: a brief turn: ROUND c: a series of professional tournaments (as in golf or tennis)

http://www.m-w.com/dictionary/tour (visited Sep. 10, 2007).

At trial, evidence is expected to show that the business of Auto Marine, Inc. consists of taking paying passengers on boat trips for (1) fishing, (2) scuba diving, (3) banana boat rides, and (4) voyages between Saipan and Mañagaha Island.  None of these seem to be mere transportation, and all but the banana boat rides fall well within

the definition of "tour" set forth above. All four of these surface boat operations involve the paying passengers' "journey for pleasure," or perhaps education.

A fishing tour includes "a series of stops" or drifts, ultimately "ending at the starting point." Certainly the catching of fish is the most important consideration, but not the only one. The paying passengers are going for the pleasure of fishing, to be guided in safety by those with knowledge of good fishing spots. Auto Marine, Inc. does not have a commercial fishing business license. Were obtaining fish the sole requirement, cliff fishing or a trip to the fish market would suffice.

A scuba tour likewise ends at the starting point, either on the boat, or perhaps after swimming through the reef to shore with the tour ending via ground transportation. Auto Marine, Inc. operates vans to bring tourists to its boats. The dive itself is unquestionably a tour, though that is not on a surface boat. *See* 3 CMC §§ 5601-11. Yet two definitions in that context provide further insight.

> "'Scuba diving tour' means to accompany scuba divers underwater as a guide *for gain*."
>
> "'Tour leader' means that person employed by a business to dive with customers and guide them underwater who is assigned by the business the duty of overall supervision of a dive and the *primary responsibility for the safety of customers*. The tour leader may be assisted by one or more employees in guiding customers on a dive; however, none of these guides shall be considered a tour leader."

3 CMC § 5603(c) & (e) (emphasis added). The fact that there are paying passengers is a factor in determining whether there is a tour, as are the duties of a surface tour boat operator for passenger safety, though these factors also exist in mere transportation. What distinguishes the surface tour boat operation with respect to fishing tours and scuba diving tours is that the boat rides are not simply modes of movement, but an inseparable part of the "journey for business, pleasure, or education often involving a series of stops and ending at the starting point."

8

The banana boat ride is a closer question. Here, the passengers are not on the boat; rather, a floating raft ("banana boat") is towed behind the boat. Hence it could be deemed closer to a thrill ride than a tour, in the nature of skydiving, hang gliding, parasailing (in the air behind a boat), water skiing, or jet skiing. Yes, there is still a "journey for . . . pleasure . . . ending at the starting point." However, the "tour" is not conducted aboard a "surface tour boat."[2]

Finally, there is the issue of whether voyages between Saipan and Mañagaha Island constitute a "tour," or simply basic point-to-point transportation. As with boat dives and fishing trips, the ride on the boat is an essential part of the experience. As stated above, the round-trip nature of trips to Mañagaha, and also the lack of overnight accommodations, all demonstrate that these voyages fall within the definition of a pleasure tour. Indeed, they are the archetypical tourists. *See* 2 CMC § 1621 note ("The imposition of a landing fee paid by ***tourists*** disembarking Managaha Island") (emphasis added), *but see* 2 CMC § 1621 ("Each commercial carrier engaged in the transport of passengers to Managaha Island"). It would be stretching the plain meaning of words to hold that our visitors' day tours to Mañagaha Island begin on the island, where many just lie on the beach, rather than at Smiling Cove or the Outer Cove Marina.

---

[2] Accordingly, for purposes of this case, Defendants withdraw the contention made at oral argument on 12 July 2007 that operating a boat towing a banana boat constitutes employment as a "surface tour boat operator" under the current version of 3 CMC § 4434(e)(1). Similarly, a submarine sightseeing tour in the Saipan lagoon is not done on the surface.

Of course, if any of the other three operations conducted by Plaintiffs — fishing boat tours, scuba boat dives, or tours to Mañagaha Island — are found by the Court to fall within the definition of "tour boat operations," then the Plaintiffs will be unable to claim they are not violating the statute, in the absence of estoppel or other legal excuse.

## IV.  CONCLUSION

This case is a vivid example of what skilled counsel can do in making a federal case about creative quibbles over the plain meaning of words such as "surface tour boat operator."  Over the years that this case has been pending, honest, law-abiding marine sports tour operators have had to struggle to pay U.S.-citizen market rates to keep their businesses afloat, while those who flout the law are able to avail themselves of the economic advantages of the much greater labor pool available in nearby countries.

While our society is moving in the direction of greater reliance on U.S. citizen and immediate relative labor, Plaintiffs have successfully bucked the law.

Neither the Equal Protection nor the federal preemption Claims for Relief state a valid cause of action.  After trial of whatever matters remain to be resolved on the evidence, these claims should be dismissed, and Plaintiffs take nothing in the way of declaratory relief.

Respectfully submitted,

OFFICE OF THE ATTORNEY GENERAL

MATTHEW T. GREGORY  # F0205
Attorney General

Dated:  Monday, 10 September 2007.

_____
GREGORY BAKA  # F0199
Deputy Attorney General

Attorneys for Defendants

n:\ . . . \gbaka\civil\immigration\Auto Marine v. Lizama\Defs'.first.trial.memorandum.pld.wpd

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5(d), the undersigned declarant states as follows:

1. I am eighteen years of age or older, and I certify that I caused to be served the following documents to the last known address(es) listed below on the date(s) indicated.

**FIRST TRIAL MEMORANDUM; CERTIFICATE OF SERVICE**

2. As set forth below, this service was accomplished by personal delivery; U.S. Mail; deposit with Clerk of Court (in attorney box), cf. Fed. R. Civ. P. 5(b)(2)(D); or electronic service, see Local Rule 5.1.

| | |
|---|---|
| G. Anthony Long, Esq.  # F0162<br>Beach Road, Oleai<br>P. O. Box 504970<br>Saipan, MP  96950-4970 | Attorney for Plaintiffs<br>Tel:  (670) 235-4802<br>Fax:  (670) 235-4801<br>E-mail: logalaw@gmail.com, gal@nmilaw.com<br>**Via Electronic Service** |

3. I declare under penalty of perjury that the foregoing is true and correct. Executed on Monday, 10 September 2007.

_Gregory Baka_
Deputy Attorney General
Attorney for Defendants