MATTHEW T. GREGORY # F0205
Attorney General
GREGORY BAKA # F0199
Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL
Hon. Juan A. Sablan Memorial Bldg., 2nd Fl.
Caller Box 10007, Capital Hill
Saipan, MP 96950-8907
Telephone:    (670) 664-2341
Fax:            (670) 664-2349
E-mail:        gbaka79@yahoo.com

Attorneys for Defendants Antonio Sablan,
Mel Grey, and Richard T. Lizama

UNITED STATES DISTRICT COURT

FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| AUTO MARINE, INC., ROLANDO SENORAN, BENJAMIN T. SANTOS, AUGUSTO SANTOS and NORMANDY SANTOS,<br><br>                    Plaintiffs,<br><br>            vs.<br><br>ANTONIO SABLAN, MEL GREY in his official capacity as Acting Director of Immigration, and RICHARD T. LIZAMA, personally and in his official capacity,<br><br>                    Defendants. | CIVIL ACTION NO. 05-0042<br><br><br>**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW; CERTIFICATE OF SERVICE**<br><br><br><br>Hearing<br> Date:         None<br>Judge:        Hon. Alex R. Munson |

**COME NOW** the Defendants, through their counsel the Commonwealth of the

Northern Mariana Islands (CNMI) Office of the Attorney General, and submit their

Proposed Findings of Fact and Conclusions of Law as follows.

# I.  INTRODUCTION

1  The facts of this case are undisputed.  What remains is the legal validity, or not,

2  of the First and Second Claims for Relief of the Amended Complaint,[1] in which the

3  Plaintiffs seek declaratory and injunctive relief.  Am. Compl. ¶¶ 69 & 76.  Both Claims for

4  Relief contest the validity of Title 3, Commonwealth Code, Subsection 4434(e)(1), barring

5  non-immigrant aliens[2] from employment as a "surface tour boat operator."  *Id.*

6  The constitutional challenge raised in the First Claim for Relief is based on

7  the Equal Protection Clause of the Fourteenth Amendment, alleging wrongful

8  discrimination based upon alienage.  *See* Am. Compl. ¶¶ 64-69.  The constitutional and

9  statutory challenge raised in the Second Claim for Relief advances the theory that

10  the CNMI's prohibition against surface tour boat operator employment by non-immigrant

11  aliens is preempted by federal jurisdiction over the coastal submerged lands and by U.S.

12  Coast Guard licensing authority over vessel operators.  Am. Compl. ¶¶ 72-76.

13  The non-immigrant aliens employment contracts and the immigration offenses

14  that the Plaintiffs were charged with in the underlying CNMI proceedings that gave rise to

15  this lawsuit are based upon Commonwealth law.  Hence, the provisions of the legislation

16  subject to challenge, and related laws, must be considered as legal facts for the other facts

17  to be understood in context.  To the extent any findings of fact are deemed to be

18  conclusions of law, they are incorporated by reference into the conclusions of law.

---

[1]  The Third through Sixth Claims for Relief  have been resolved through a settlement agreement between the parties.  *See* Answer to Am. Compl. ¶¶ 77-124 (D.N.M.I. filed Dec. 22, 2006).

[2]  While commonly referred to in the CNMI as "nonresident aliens" even after their arrival — based on their status before they ever came to the CNMI — for clarity the term "non-immigrant alien" will be used.  *See Yang v. American Int'l Knitters Corp.*, 789 F. Supp. 1074, 1076-77 (D.N.M.I. 1992).

2

1    If Plaintiffs can prevail on any theory, they would be entitled to declaratory or

2    injunctive relief against the CNMI's enforcement of Title 3, Commonwealth Code,

3    Subsection 4434(e)(1).  With respect to the Conclusions of Law, given the doctrine that

4    constitutional issues should be avoided if possible, the statutory portion of Plaintiffs'

5    argument that Subsection 4434(e)(1) is preempted by U.S. Coast Guard licensing authority

6    should be considered first, because a resolution in Plaintiffs' favor would render

7    determination of the other theories unnecessary.

8    On the other hand, if any of the individual Plaintiffs' activities run afoul of

9    Subsection 4434(e)(1), his violations of that law are not excused by his other activities

10    consistent with it, and if one or more Plaintiffs were wrongly charged, which Defendants

11    deny, that would not establish the invalidity of the law, as opposed to a mistake of fact by

12    CNMI immigration law enforcement.

13

14    ## II.  FINDINGS  OF  FACT

15    1.    The CNMI has enacted the Nonresident Workers Act, 3 CMC §§ 4411-52,

16    to prescribe and limit the conditions under which foreign workers may enter the

17    Commonwealth and remain for employment, for the purposes of "boosting its economy,

18    giving preference to its resident workers, and providing a system of regulating and

19    accounting for its nonresident workforce."  *Sagana v. Tenorio*, 384 F.3d 731, 741 (9th Cir.

20    2004).

21    2.    Under the Alien Labor Act of 1986, CNMI Public Law 5-32, Section 3(b), signed

22    into law on 29 April 1987 and effective 90 days thereafter, *Id.* § 22, a new definition

23    was added as 3 CMC § 4412(j) to read as follows:

24        (j) "Job classification" means the job classification described and listed as an
        occupational group under the Dictionary of Occupational Titles.  Each time the

25

3

1   words "job title" appear in this division, the words "job classification" shall be
2   substituted in its place.

3   Alien Labor Act of 1986, N.M.I. Pub. L. 5-32, § 3(b), *codified at* 3 CMC § 4412(j) (2004)

4   (attached as Appendix 1).

5   3.     The U.S. Department of Labor, Dictionary of Occupational Titles (DOT) (4th Ed.,

6   Rev. 1991), is available online, http://www.oalj.dol.gov/libdot.htm .  The DOT provides

7   definitions of the listed job classifications.  Also online is Appendix A: Revisions from the

8   4th Edition DOT,

9   http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPA.HTM (visited Sep. 13,

10  2007):

11      The last item in the trailer, the Date of Last Update (DLU), is the date of the most
        recent material gathered in support of that occupation.  The date "1977" indicates
12      that the occupation has not been studied since the publication of the fourth edition
        DOT in 1977.  This entry allows the reader to identify the currency of each
13      definition. It also identifies 'new' definitions in the DOT or alerts the reader to
        previously published and recently updated definitions.
14

15  *Id.*  An index of job classifications is also found at that website,

16  http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTALPHA.HTM , and the

17  abbreviation N.E.C. means "Not Elsewhere Classified."

18  4.     CNMI Public Law 5-32 was enacted in 1987, and the fourth edition of the DOT was

19  issued by the U.S. Department of Labor in 1977 and revised in 1991.  The DOT has since

20  been replaced by O*Net™, as set forth on the very first page of the DOT web page:

21      The DOT was created by the Employment and Training Administration, and was
        last updated in 1991.  It is included on the Office of Administrative Law Judges web
22      site because it is a standard reference in several types of cases adjudicated by the
        Office of Administrative Law Judges, especially labor-related immigration cases.
23
        The DOT, however, has been replaced by the O*NET.  For information on O*Net,
24      see

25      O*Net™ OnLine:  http://online.onetcenter.org

1    O*Net™ Resource Center:  http://www.onetcenter.org

2    O*Net™ Code Connector:  http://www.onetcodeconnector.org

3  http://www.oalj.dol.gov/libdot.htm .  The O*Net uses a "position description" rather than

4  the "job classification definition" of the DOT.

5  5.    On Monday, 17 September 2007 the CNMI issued Proposed Amendments to its

6  Alien Labor Rules & Regulations that would require all job position descriptions to be

7  defined by the O-NET and all Job Vacancy Announcement job qualifications to be based

8  on the O-NET, with no arbitrary qualifications to be imposed.  Proposed Amendments to

9  Alien Labor Rules & Regulations, Commw. Reg. 26,785 at 26,792 (Sep. 17, 2007)

10  (attached as Appendix 2).

11  6.    The job classification "surface tour boat operator" is not found in the current

12  Dictionary of Occupational Titles (4th Ed., Rev. 1991) or in O*Net.

13  7.    However, the following definition does appear in the DOT:

14  **Sightseeing-Boat Operator (water trans.)**

15  911.663-010 MOTORBOAT OPERATOR (any industry)

16      Operates motor-driven boat to carry passengers and freight, take depth soundings
in turning basin, serve as liaison between ships, ship to shore, harbor and beach area
17  patrol, or tow, push, or guide other boats, barges, logs, or rafts: Casts off securing
lines and starts motor.  Starts boat and steers boat with helm or tiller.  Maintains
18  equipment, such as range markers, fire extinguishers, boat fenders, lines, pumps,
and fittings.  Services motor by changing oil and lubricating parts.  Cleans boat and
19  repairs hull and superstructure, using handtools, paint, and brushes.  May tune up,
overhaul, or replace engine.  May give directions for loading and seating in boat.
20  May be designated according to type of boat operated as Boat Tender (logging);
Boomboat Operator (logging); Charter-Boat Operator (amuse. & rec.);
21  **Sightseeing-Boat Operator (water trans.)**; Water-Taxi Driver (water trans.); or
operate motor-driven boat to haul fish or other marine life from offshore fishing
22  vessel to buyer and be designated Run-Boat Operator (water trans.).
GOE: 05.08.04 STRENGTH: M GED: R3 M2 L3 SVP: 5 DLU: 77
23
24  Under O*Net, the analogous positions are for 53-5022.00 "Motorboat Operators,"

25

1    http://online.onetcenter.org/link/details/53-5022.00 , who are related to 53-5021.01 "Ship

2    and Boat Captains," http://online.onetcenter.org/link/details/53-5021.01 , and 53-5021.02

3    Mates- Ship, Boat, and Barge " http://online.onetcenter.org/link/details/53-5021.02 .

4    8.      Section 8 of the Alien Labor Act of 1986 created the provision that is at issue in this

5    case.  N.M.I. Pub. L. 5-32, § 8(e), *codified at* 3 CMC § 4434(e)(1) (2004).  In addition to

6    creating several new sections, Public Law 5-32 also amended 3 CMC § 4434(a),

7    *see* N.M.I. Pub. L. 5-32, § 8(a), to conclude as follows:

8              Approval by the chief, as required by this section, is a review of the contract
          for compliance with the provisions of this chapter.  Such review shall not
9         subject the chief or the Commonwealth government to liability on the
          employment contract, even if the chief approves a contract which does not
10        comply with all the provision [sic] of this chapter.

11   Alien Labor Act of 1986, N.M.I. Pub. L. 5-32, § 8(a), *codified at* 3 CMC § 4434(a)

12   (2004).

13   9.      The relevant provisions of the statue against which the First and Second Claims for

14   Relief of the Amended Complaint seek declaratory relief are as follows:

15       **§ 4434.       Procedure and Requirements: Approval of Contract by Director.**

16           After entering into a nonresident employment agreement pursuant to 3 CMC
          § 4433, ***an employer may use a nonresident worker*** to fill the job vacancy covered
17        by this agreement, ***subject to the following procedures and conditions***:

18        * * * *

19        (e)     (1)  The Director of Labor shall not approve nonresident worker certificates
          for the following job classifications: taxi cab driver, secretary, bookkeeper,
20        accounting clerk, messenger, receptionist, surface tour boat operator, bus driver,
          including tour bus driver, and telephone switchboard operator.
21

22   3 CMC § 4434(e)(1) (2004) (emphasis added).

23   10.     There are separate provisions, enacted as part of the Commonwealth Entry and

24   Deportation Act of 1983, codified at 3 CMC §§ 4301-82, rather than the Nonresident

25

1    Workers Act, codified at 3 CMC §§ 4411-52, dealing with vessel and aircraft crew

2    entering the Commonwealth. *See, e.g.,* 3 CMC § 4321(e).

3    11.    Accordingly, when Japanese cruise ships visit the Northern Mariana Islands with

4    foreign crew members, Title 3, Commonwealth Code, Subsection 4434(e)(1) is not applied

5    to such ships.  Stip. Facts ¶ 38.

6    12.    Individual Plaintiffs Roland Elvis Alvaran Senoran, Benjamin Ibanez Santos,[3]

7    Augusto Ibanez Santos and Normandy Ibanez Santos are all citizens of the Republic of the

8    Philippines.  Stip. Facts ¶ 2, Am. Compl. ¶ 3.

9    13.    The individual Plaintiffs were admitted to the Commonwealth pursuant to the

10   Nonresident Workers Act, and were lawfully present in the Commonwealth so long as they

11   were lawfully employed pursuant to an employment contract approved by the CNMI

12   Director of Labor.  Stip. Facts ¶¶ 6-7, Am. Compl. ¶¶ 12-13, Pls.'Ex. 4-5 (Roland

13   E.A. Senoran contracts), Pls.'Ex. 12-17 (Benjamin I. Santos contract and renewal

14   applications), Pls.'Ex. 10-11 (Augusto I. Santos contracts), Pls.'Ex. 6 & 8 (Normandy

15   I. Santos contracts).

16   14.    Plaintiff Auto Marine, Inc. is a corporation formed under laws of the CNMI and

17   operates a business which engages in water sport activities which include but are not

18   limited to parasailing, banana boat rides, scuba diving, and transporting passengers.  Stip.

19   Facts ¶¶ 1 & 11, Am. Compl. ¶¶ 2 & 21.

20   15.    On Wednesday, 9 February 2005, Defendant Richard T. Lizama executed a

21   declaration in support of an arrest warrant stating that Roland E.A. Senoran had violated

22

23         [3]  While the caption and Paragraph 3 of the Amended Complaint refer to him as
     Benjamin "T." Santos, all other references show his middle name as Ibanez, shared by all
     three brothers.  While Plaintiffs' Exhibits and Stipulated Facts refer to the individual
24   Plaintiffs in varying orders, for consistency this Proposed Findings of Fact and
     Conclusions of Law will retain the order set forth in the caption of the Amended
25   Complaint.

7

the statutory prohibition of 3 CMC § 4434(e)(1).  Pls.'Ex. 7 (2 pages [#14-15]).[4]
Specifically, respondent was charged with "operating a boat as a boat operator," ¶ 4;[5]
being "primary boat operator of the 54-foot boat; the biggest on the Auto Marine, Inc.
stocks [sic], using [sic] for transporting tourist [sic] to conduct the ocean or sea walk
activities," ¶ 5; and "operating a seven to fifteen-passenger van transporting tourist [sic] to
and from Smiling Cove."  ¶ 6.  The Declaration was filed in CNMI Superior Court on 10
February 2005.  Pls.'Ex. 7 at 1 (top right corner).

16.     On Wednesday, 9 February 2005, Defendant Richard T. Lizama executed a
declaration in support of an arrest warrant stating that Benjamin I. Santos had violated the
statutory prohibition of 3 CMC § 4434(e)(1).  Pls.'Ex. 18 (2 pages [#36-37]).  Specifically,
respondent was charged with "operating a boat as a boat operator for tourists dropped off
at Smiling Cove."  ¶ 4.  The Declaration was filed in CNMI Superior Court on 10
February 2005.  Pls.'Ex. 18 at 1 (top right corner).

17.     On Wednesday, 9 February 2005, Defendant Richard T. Lizama executed a
declaration in support of an arrest warrant stating that Augusto I. Santos had violated the
statutory prohibition of 3 CMC § 4434(e)(1).  Pls.'Ex. 19 (2 pages [#38-39]).  Specifically,
respondent was charged with "operating a boat as a boat operator with tourist [sic]
onboard," ¶ 4; "operating an engine boat with a banana boat being towed," ¶ 5;[6] and

_____

[4]  The hard-copy of Plaintiffs' Exhibits is unnumbered.  However, page numbers are supplied when viewed as an electronic Portable Document Format file, and the page numbers in brackets and small font herein correspond to that PDF numbering, beginning with the exhibit cover sheet signed by counsel.

[5]  Defendants concede that Exhibit 7, Paragraph 4 does not, standing alone, charge a violation of Subsection 4434(e)(1), because it does not allege that tourists were aboard or that it was used as a surface tour boat.  Some uses, such as towing a banana boat, do not appear to violate the statute.

[6]  Defendants concede that Exhibit 19, Paragraph 5 does not charge a violation of Subsection 4434(e)(1).  *See* note 5, *supra*.

8

1    "operating the tour vans with tourist [sic] onboard been [sic] transported to and from

2    Smiling Cove."  ¶ 8.  The Declaration was filed in CNMI Superior Court on 10 February

3    2005.  Pls.'Ex. 19 at 1 (top right corner).

4    18.    On Wednesday, 9 February 2005, Defendant Richard T. Lizama executed a

5    declaration in support of an arrest warrant stating that Normandy I. Santos had violated the

6    statutory prohibition of 3 CMC § 4434(e)(1).  Pls.'Ex. 9 (2 pages [#20-21]).  Specifically,

7    respondent was charged with "operating a boat as a boat operator with tourist [sic]

8    onboard", ¶ 4; and "operating a boat as a boat operator."  ¶ 5.[7]  The Declaration was filed

9    in CNMI Superior Court on 10 February 2005.  Pls.'Ex. 9 at 1 (top right corner).

10    19.    As a result of the foregoing charged violations of 3 CMC § 4434(e)(1), the four

11    individual Plaintiffs were arrested subject to $1000 bail, and deportation proceedings were

12    instituted against them.  Stip. Facts ¶¶ 35-36, Am. Compl. ¶¶ 47-48 & 53; *Office of the*

13    *Attorney General v. Roland E.A. Senoran*, Civ. No. 05-0058, Arrest Warrant (N.M.I.

14    Super. Ct. Feb. 10, 2005) (Wiseman, J.); *Office of the Attorney General v. Benjamin I.*

15    *Santos*, Civ. No. 05-0056, Arrest Warrant (N.M.I. Super. Ct. Feb. 10, 2005) (Wiseman,

16    J.); *Office of the Attorney General v. Augusto I. Santos*, Civ. No. 05-0055, Arrest Warrant

17    (N.M.I. Super. Ct. Feb. 10, 2005) (Wiseman, J.); *Office of the Attorney General v.*

18    *Normandy I. Santos*, Civ. No. 05-0057, Arrest Warrant (N.M.I. Super. Ct. Feb. 10, 2005)

19    (Wiseman, J.).

20    20.    On 6 September 2005 criminal charges were instituted against the President of Auto

21    Marine, Inc., Adonis I. Santos, for employing aliens illegally based upon the facts

22    underlying the foregoing four deportation cases.  Stip. Facts ¶ 37, Am. Compl. ¶ 54.

23    The criminal case has been stayed pending the resolution of this declaratory relief action.

24

25            [7]  Defendants concede that Exhibit 9, Paragraph 5 does not, standing alone, charge a
violation of Subsection 4434(e)(1).  *See* note 5, *supra*.

1    21.     As set forth below, ***it was only after the arrests*** and institution of deportation

2    proceedings ***that the language in the*** subsequent versions of three of the four individual

3    Plaintiffs' ***employment contracts was modified to allow driving boats "when necessary."***

4    *See* ¶¶ 27-28 (Roland E.A. Senoran contracts), 36-37 (Augusto I. Santos contracts), 41-42

5    (Normandy I. Santos contracts), *infra*, but see ¶ 32 (5 September 2001 contract

6    of Benjamin I. Santos already containing such language).[8]

7    22.     Prior to the arrest of the four individual Plaintiffs in their deportation cases pursuant

8    to the 10 February 2005 Declarations of Defendant Richard T. Lizama, their contracts

9    were signed by Adonis I. Santos, President of Auto Marine, Inc.  Pls.' Ex. 5 (Roland E.A.

10   Senoran, 2004), Pls.' Ex. 12-15 (Benjamin I. Santos, 2001-04), Pls.' Ex. 11 (Augusto I.

11   Santos, 2004), Pls.' Ex. 8 (Normandy I. Santos, 2004).

12   23.     Following the arrest of the four individual Plaintiffs in their deportation cases

13   pursuant to the 10 February 2005 Declarations of Defendant Richard T. Lizama,

14   their contracts were signed by Soloman B. Macabugao, Corporate Secretary of

15   Auto Marine, Inc.  Pls.' Ex. 4 (Roland E.A. Senoran, 2005), Pls.' Ex. 16-17 (Benjamin I.

16   Santos, 2005-06), Pls.' Ex. 10 (Augusto I. Santos, 2005), Pls.' Ex. 6 (Normandy I. Santos,

17   2005).

18

19          [8]  The Stipulation of Facts with respect to Benjamin I. Santos provides, "At all times
      relevant herein, the employment contract between Benjamin and Auto Marine expressly
20    allowed Benjamin to operate or drive a boat or boats and vehicles **as necessary**."  Stip.
      Facts ¶ 19 (emphasis added).  The significance of the words and the legal consequences of
21    contractual job descriptions are discussed in the Conclusions of Law.

22          A similar clause beginning, "At all times relevant herein," was stipulated to with
      respect to Augusto I. Santos.  Stip. Facts ¶ 32, *see also* Am. Compl. ¶ 44.  As discussed
23    below, this latter stipulation is contradicted by the changes in the contracts themselves.
      *See* Pls.' Ex. 10-11.  A factually incorrect stipulation without foundation cannot stand
24    against a factually stipulated clear and convincing evidentiary document to the contrary.

25          No such stipulation was entered into with respect to Roland E.A. Senoran and
      Normandy I. Santos.

24.    These changes in the language of three out of four contracts, and the removal of the President of Auto Marine from direct involvement with the contracts reflect an awareness by Plaintiffs of Title 3, Commonwealth Code, Subsection 4434(e)(1), and of inconsistency between the statute and the actual work being performed by the individual Plaintiffs.

25.    Plaintiff Roland Elvis Alvaran Senoran was employed by Auto Marine as a Diving Manager.  Stip. Facts ¶ 12, Am. Compl. ¶¶ 23 & 49.

26.    On 17 July 2002 Roland E.A. Senoran was licensed by the United States Coast Guard (USCG) as a U.S. Merchant Marine Officer.  Stip. Facts ¶ 12, Am. Compl. ¶ 24, Pls.'Ex. 1 (1 page [#2]).  His license allows him to operate uninspected undocumented passenger vessels as defined in 46 U.S.C. § 2101(42) upon near coastal waters not more than 100 miles offshore.  Stip. Facts ¶ 16, Am. Compl. ¶ 27, Pls.' Ex. 1 (1 page [#2]). His license expired 17 July 2007, Stip. Facts ¶ 14, Am. Compl. ¶ 25, and was valid when the deportation affidavit was filed in Superior Court on 10 February 2005.  Stip. Facts ¶ 15, Am. Compl. ¶ 26.

27.    An employment contract for Roland E. A. Senoran as a "Manager, Diving" with duties and responsibilities to be "in charge of the management, operation, maintenance of the diving shop, make necessary schedules of the diving customers, the places and times of diving and other related duties," was signed 23 May 2003 by the employee and Adonis I. Santos at Saipan, expired 23 May 2004, and was approved by the CNMI Director of Labor 29 Mar 2004.  Pls.' Ex. 5 (3 pages [#8-10]).

28.    By contrast, following his arrest under the 10 February 2005 deportation case, the next annual employment contract for Roland E. A. Senoran as a "Manager, Diving" had new duties and responsibilities, specifically, to "to manage and maintain the operation of the diving, take reservations, and make necessary schedules of the diving sites and times of diving, other related duties such as **driving** vehicles and **boats when necessary**," was

signed 20 May 2005 by the employee and Soloman B. Macabugao, Secretary, at Saipan, expired 23 May 2006, and was approved by Director of Labor 25 May 2005.  Pls.' Ex. 4 (emphasis added) (3 pages [#5-7]).

29.     The job classification "Diving Manager" or "Manager, Diving" is not found in the current  Dictionary of Occupational Titles (4th Ed., Rev. 1991).  However, the DOT index lists scores of managers, ranging from

> manager, administrative services (any industry) 169.167-034
>> to
> Manager, Wrestler (amuse. & rec.) 153.117-014 .

Among those that at first look appear related to the duties of a diving manager are:

> 183.117-010 MANAGER, BRANCH (any industry) alternate titles: agent; manager, area; manager, division; manager, plant
> 184.117-050 MANAGER, OPERATIONS (air trans.; motor trans.; r.r. trans.; water trans.)
> 184.117-066 manager, rates and schedules (air trans.; motor trans.; water trans.)

However, upon looking at the occupational title descriptions, the described duties appear dissimilar to those in the contract of Roland E. A. Senoran as a "Diving Manager."  Nor does O*Net have a position description for a "Diving Manager."

http://www.onetcodeconnector.org/find/result?s=diving+manager

30.     Benjamin I. Santos is currently employed by Auto Marine and has been employed by Auto Marine since 1999.  Stip. Facts ¶ 17, Am. Compl. ¶ 28.

31.     On 3 February 2004[9] Benjamin I. Santos was licensed by the USCG as a U.S. Merchant Marine Officer.  Stip. Facts ¶ 20, Am. Compl. ¶ 31, Pls.'Ex. 3 (1 page [#4]).

---

[9] Paragraph 20 of the Stipulated Facts misstates the year as 2003, but Plaintiffs' Exhibit 3 correctly indicates the year as 2004.

His license allows him to operate uninspected undocumented passenger vessels as defined in 46 U.S.C. § 2101(42) upon near coastal waters not more than 100 miles offshore. Stip. Facts ¶ 22, Am. Compl. ¶ 33, Pls.' Ex. 3 (1 page [#4]). His license expires 3 February 2009, Stip. Facts ¶ 21, Am. Compl. ¶ 32, and was valid when the deportation affidavit was filed in Superior Court on 10 February 2005. Stip. Facts ¶ 22, Am. Compl. ¶ 33.

32.     An employment contract for Benjamin I. Santos as a "Maintenance Mechanic"[10] with duties and responsibilities "to do repairs and general maintenance and overhauls of company vehicles and boats and other related duties to be assign [sic] such as **driving boats**/ vehicles **when necessary**," was signed 5 September 2001 by the employee and Adonis I. Santos at Saipan, expired 13 September 2002, and was approved by the CNMI Director of Labor 14 October 2001. Pls.' Ex. 12 (emphasis added) (3 pages [#28-30]).

33.     Applications for renewal of the Entry Permit or Labor Identification Certificate of Benjamin I. Santos were timely executed annually from 2002 to 2006 and approved by the Director of Labor. Pls.' Ex. 13-17. [11]

34.     Although the job classification "Maintenance Mechanic" is not found in the current Dictionary of Occupational Titles (4th Ed., Rev. 1991), the term "Mechanic, Marine Engine" is a recognized alternative for "Engineer (Water Trans.)," and is analogous to a "Ship Engineer" as described by O*Net. *See* ¶ 43, *infra*. Under the DOT, a less skilled assistant to a Water Transportation Engineer is a

911.584-010 **MARINE OILER (water trans.)** alternate titles: oiler; striker

---

[10]  Although Benjamin I. Santos is alleged to have been employed as a "Manager" at the time of his arrest in February 2005, Am. Compl. ¶ 50, the available evidence shows his title to have been a "Maintenance Mechanic."

[11]  The copy of the 2003 Labor Identification Certificate renewal submitted as Pls.' Exhibit 14 does not bear the signature of the Director of Labor, but Defendants have no reason to believe it was not eventually signed, given the subsequent renewal.

1
2
3
4
5

    Oils and greases moving parts, such as gears, shafts, and bearings, of engines and auxiliary equipment used to propel maritime vessels:  Examines machinery for specified pressure and flow of lubricants.  Fills oil cups on machinery with grease and lubricating oil, according to machinery lubrication instructions.  Reads pressure and temperature gauges and records data in engineering log.  **Assists** ENGINEER (water trans.) **in overhauling and adjusting machinery**.  May lubricate deck machinery when vessel is unloading cargo.
GOE: 05.12.08 STRENGTH: M GED: R3 M2 L2 SVP: 4 DLU: 77

6
7
8
9
10
11
12

http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT09A.HTM  (emphasis added) (visited Sep. 13, 2007).  The contract language may be marginally adapted from the DOT definition, with "repairs and general maintenance" from the contract corresponding to the portion of the definition prior to the emphasized portion, and the overhauling language somewhat more directly.  The contract certainly does not quote from the DOT definition. Under O*Net, the analogous positions are for "Sailors and Marine Oilers," 53-5011.00, in this case the latter.  http://online.onetcenter.org/link/details/53-5011.00 .

13
14

35.    Augusto I. Santos is currently employed by Auto Marine and has been employed by Auto Marine since 2004.  Stip. Facts ¶ 30, Am. Compl. ¶ 42.

15
16
17
18
19
20

36.    An employment contract for Augusto I. Santos as a "Helper Mechanic" with duties and responsibilities to "Assist the mechanic in the repair of autos and boats.  Do minor troubleshooting, changing oils [sic], and keeping the shop tools in their places.  Other related duties such as keeping the shop clean," was signed 10 September 2004 by the employee and Adonis I. Santos at Saipan, expired 1 October 2005, and was approved by the CNMI Director of Labor 17 December 2004.  Pls.' Ex. 11 (3 pages [#25-27]).

21
22
23
24
25

37.    By contrast, following his arrest under the 10 February 2005 deportation case, the next annual employment contract for Augusto I. Santos as a "Helper Mechanic" had new duties and responsibilities, specifically, "to help the mechanic in repairing and maintaining vehicles, boats, jetskis and other engines, and other related duties such as **driving boats** and vehicles **when necessary**," was signed 30 September 2005 by the

1  employee and Soloman B. Macabugao, Secretary, at Saipan, expired 1 October 2006,

2  and was approved by Director of Labor 13 October 2005.  Pls.' Ex. 10 (emphasis added)

3  (3 pages [#22-24]).

4  38.    Although the job classification "Helper Mechanic" is not found in the current

5  Dictionary of Occupational Titles (4th Ed., Rev. 1991), the term "Mechanic, Marine

6  Engine" is a recognized alternative for "Engineer (Water Trans.)," and is analogous to a

7  "Ship Engineer" as described by O*Net.  *See* ¶ 43, *infra*.  Under the DOT, a less skilled

8  assistant to a Water Transportation Engineer is a "Marine Oiler (water trans.)."  *See* ¶ 34,

9  *supra*.  The description of a "Helper Mechanic" seems intended by Auto Marine, Inc. to

10  be slightly less skilled than a "Maintenance Mechanic" in that "overhauls of company

11  vehicles and boats" are not included in the Helper Mechanic's contractual job

12  responsibilities, and the incumbent is the only one of the four individual Plaintiffs without a

13  USCG license.

14  39.    Normandy I. Santos is currently employed by Auto Marine and has been employed

15  by Auto Marine since 2001.  Stip. Facts ¶ 24, Am. Compl. ¶ 35.

16  40.    On 7 August 2003 Normandy I. Santos was licensed by the USCG as a

17  U.S. Merchant Marine Officer.  Stip. Facts ¶ 26, Am. Compl. ¶ 37, Pls.'Ex. 2 (1 page [#3]).

18  His license allows him to operate uninspected undocumented passenger vessels as defined

19  in 46 U.S.C. § 2101(42) upon near coastal waters not more than 100 miles offshore.  Stip.

20  Facts ¶ 29, Am. Compl. ¶ 40, Pls.' Ex. 2 (1 page [#3]).  His license expires 7 August 2008,

21  Stip. Facts ¶ 27, Am. Compl. ¶ 38, and was valid when the deportation affidavit was filed

22  in Superior Court on 10 February 2005.  Stip. Facts ¶ 28, Am. Compl. ¶ 39.

23  41.    An employment contract for Normandy I. Santos as an "Engineer (Water Trans)"

24  with the following duties and responsibilities:  "supervises and coordinates activities

25  of crews engaged [in] the operation and maintenance of propulsion and other engines,

15

1  inspects engines and other equipments [sic] and orders crews to repair or replace defective

2  parts.  Starts engines to propel ship and regulates engines and power transmissions or

3  control speed of ship.  Other related duties."  It was signed 28 July 2004 by the employee

4  and Adonis I. Santos at Saipan, expired 30 July 2005, and was approved by the CNMI

5  Director of Labor 5 August 2004.  Pls.' Ex. 8 (3 pages [#16-19]).

6  42.    By contrast, following his arrest under the 10 February 2005 deportation case,

7  the next annual employment contract for Normandy I. Santos as an "Engineer (Water

8  Trans)" had new duties and responsibilities, specifically, "to supervise and coordinate the

9  activities of the boat crews engaged in the operation and maintenance of propulsion and

10  other boat engines, inspect engines and other equipments [sic] and order crews to repair or

11  replace defective parts, starts engines to propel boat and regulates engines and control the

12  speed of the boat.  Other **related duties as driving the boat**."  It was signed 27 & 28 July

13  2005 by the employee and Soloman B. Macabugao, Secretary, at Saipan, expired 30 July

14  2006, and was approved by Director of Labor 6 October 2005.  Pls.'  Ex. 6 (emphasis

15  added) (3 pages [#11-13]).

16  43.    The job classification "Engineer (Water Trans)" is found in the current  Dictionary

17  of Occupational Titles (4th Ed., Rev. 1991):

18  **197.130-010 ENGINEER (water trans.)** alternate titles: marine engineer; **mechanic,**

19  **marine engine**

20      **Supervises and coordinates activities of crew engaged in operating and**
**maintaining propulsion engines and other engines**, boilers, deck machinery, and

21  electrical, refrigeration, and sanitary equipment aboard ship:  **Inspects engines and**
**other equipment and orders crew to repair or replace defective parts.  Starts**

22  **engines to propel ship and regulates engines and** power transmission to **control**
**speed of ship.**  Stands engine-room watch during specified periods, observing that

23  required water levels are maintained in boilers, condensers, and evaporators, load
on generators is within acceptable limits, and oil and grease cups are kept full.

24  Repairs machinery, using handtools and power tools.  Maintains engineering log and
bell book (orders for changes in speed and direction of ship).  May be required to

25  hold appropriate U.S. Coast Guard license, depending upon tonnage of ship, type of

engines, and means of transmitting power to propeller shaft.  When more than one ENGINEER (water trans.) is required, may be designated Engineer, Chief (water trans.); Engineer, First Assistant (water trans.); Engineer, Second Assistant (water trans.); Engineer, Third Assistant (water trans.).  May be designated according to ship assigned as Barge Engineer (water trans.); Cannery-Tender Engineer (water trans.); Engineer, Fishing Vessel (water trans.); Tugboat Engineer (water trans.). May be designated Cadet Engineer (water trans.) when in training.
GOE: 05.06.02 STRENGTH: M GED: R4 M3 L3 SVP: 8 DLU: 77

http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT01F.HTM (emphasis added).

The contract language is clearly adapted from the DOT definition.  Under O*Net, the

analogous positions are for "Ship Engineers," 53-5031.00.

http://online.onetcenter.org/link/details/53-5031.00

44.    The boats owned by Auto Marine, Inc. fall within the definition of 46 U.S.C.

§ 2101(42) and do not weight more than 100 gross registered tons.  Stip. Facts ¶¶ 33-34,

Am. Compl. ¶¶ 45-46.

45.    Title 3, Commonwealth Code, Subsection 4434(e)(1), is not applied to Tinian

Shipping which operates ferry service between Saipan and Tinian.  Stip. Facts ¶ 39.

46.    The parties have stipulated, "At all times relevant herein, Auto Marine operated its

vessels in waters over the submerged lands over which the United States has sovereignty."

However, this stipulation suffers from a defect of imprecision.  It does not state whether

Auto Marine operated its vessels "solely (exclusively)" in such waters, as opposed to

having done so "intermittently."  It cannot have meant "continuously," as in literally "all

times," or a perpetual voyage, though all these interpretations depend on the undefined

term of what times were "relevant herein," presumably just when underway during all or

portions of the voyages.

47.    The imprecision exists because this "statement of fact" actually implicates an issue

concerning the legal status of the "Internal Waters" of the CNMI, including the Saipan

Lagoon.  This is a question of law between the Commonwealth and the United States

1   about which, to the extent it is unresolved, the Plaintiffs would not have standing to assert

2   an interest or position.  However, it is the view of the CNMI that there is no remaining

3   controversy over this issue.  *See* N.M.I. Att'y Gen. Op. 07-01 (May 8, 2007), *reprinted in*

4   Commw. Reg. 26,517 at 26,517 to 26,522 (CNMI retains exclusive jurisdiction over

5   internal waters) (attached as Appendix 3).[12]

6   48.    Auto Marine, Inc. conducted at least some of its boat operations from the vicinity of

7   Smiling Cove.  Pls.'Ex. 7, 18, 19 (arrest warrant declarations).

8   49.    The business activities of Plaintiff Auto Marine, Inc. include but are not limited to

9   parasailing, banana boat rides, scuba diving, and transporting passengers.  Stip. Facts ¶ 11,

10  Am. Compl. ¶ 21.

11  50.    Counsel for Plaintiffs has represented to counsel for Defendants that other

12  referenced activities include fishing trips outside the Saipan Lagoon (in waters clearly

13  under sovereignty the United States) and transporting passengers to and from Mañagaha

14  Island.  *See* Defendants' First Trial Memorandum [Brief] at 7, lines 21-23 (D.N.M.I. filed

15  Sep. 10, 2007) ("At trial, evidence is expected to show that the business of Auto Marine,

16  Inc. consists of taking paying passengers on boat trips for (1) fishing, (2) scuba diving,

17  (3) banana boat rides, and (4) voyages between Saipan and Mañagaha Island.")

18  51.    At least some of the popular dive sites on Saipan require transit outside the internal

19  waters of the Commonwealth, that is, beyond the coastline and fringing reefs, when

20  approached by a boat departing from the vicinity of Smiling Cove, and numerous tourist

21  fishing trips similarly go outside the Saipan Lagoon.

22  52.    To that extent, it is undisputed that "At all times relevant herein, Auto Marine

23  ***intermittently*** operated its vessels in waters over the submerged lands over which the

24  

25      [12] It was clearly not the purpose of the stipulation of fact to decide a legal issue.

1   United States has sovereignty." To the extent that Plaintiffs contend that the CNMI lacks

2   exclusive jurisdiction over the Saipan Lagoon as internal waters, that is a question of law,

3   but it is likewise undisputed that Auto Marine, Inc. did operate boats in the Saipan

4   Lagoon, in addition to wherever they sometimes went outside the lagoon.

5   53.     A similar question of law exists concerning the operation by Auto Marine of its vans

6   used to transport tourists on land. Under the CNMI Vehicle Code, "motor bus" is defined

7   as "a ***motor vehicle operated for the carriage of passengers for hire*** or a school bus

8   which is ***designed to carry more than eight passengers***." 9 CMC § 1102(s) (emphasis

9   added). Hence, vans are issued "bus" license plates. If Auto Marine offers optional

10  ground transportation at no additional charge as part of its boat rides, does that constitute

11  "carriage of passengers for hire"? *See* Pls.' Ex. 7, ¶ 6 ("operating a seven to fifteen-

12  passenger van transporting tourist [sic] to and from Smiling Cove"), Pls.' Ex. 19, ¶ 8

13  ("operating the tour vans with tourist [sic] onboard been [sic] transported to and from

14  Smiling Cove") (arrest warrant declarations for Roland E.A. Senoran and Augusto I.

15  Santos).

16  54.     Under the Proposed Amendments to the CNMI Alien Labor Rules & Regulations

17  promulgated on Monday, 17 September 2007, a new Section II(A)(1)(h) would be added

18  to prohibit non-immigrant aliens from working as a "motor boat operator," *Id.*

19  § II(A)(1)(h)(iv), or as a "ship and boat captain," *Id.* § II(A)(1)(h)(vii), without regard to

20  whether the boat has tourists onboard or is a "surface tour boat." Proposed Amendments

21  to Alien Labor Rules & Regulations, Commw. Reg. 26,785 at 26,792 (Sep. 17, 2007)

22  (attached as Appendix 2).

23

24                              **III.  CONCLUSIONS  OF  LAW**

25  **A.  Overview**

19

1    To the extent any findings of fact are deemed to be conclusions of law, they are

2    incorporated by reference into the conclusions of law.

3    The constitutional challenge raised in the First Claim for Relief is based on

4    the Equal Protection Clause of the Fourteenth Amendment, alleging wrongful

5    discrimination based upon alienage. *See* Am. Compl. ¶¶ 64-69.  The constitutional and

6    statutory challenge raised in the Second Claim for Relief advances the theory that

7    the CNMI's prohibition against surface tour boat operator employment by non-immigrant

8    aliens is preempted by federal jurisdiction over the coastal submerged lands and by U.S.

9    Coast Guard licensing authority over vessel operators.  Am. Compl. ¶¶ 72-76.

10    As set forth in the Introduction at Part I above, if Plaintiffs can prevail on any

11    theory, they would be entitled to declaratory or injunctive relief against the CNMI's

12    enforcement of Title 3, Commonwealth Code, Subsection 4434(e)(1).  Given the doctrine

13    that constitutional issues should be avoided if possible, the statutory portion of Plaintiffs'

14    argument that Subsection 4434(e)(1) is preempted by U.S. Coast Guard licensing authority

15    should be considered first, because a resolution in Plaintiffs' favor would render

16    determination of the other theories unnecessary.

17    When doing so, however, the Second Claim for Relief should be denied statutorily

18    and constitutionally (1) because federal maritime safety legislation is not preemptive of

19    CNMI immigration law, (2) because the CNMI has extraterritorial immigration

20    jurisdiction, (3) because the CNMI has concurrent jurisdiction over nearby federal waters,

21    and constitutionally (4) because the CNMI has exclusive jurisdiction over Internal Waters.

22    The First Claim for Relief should be denied statutorily and constitutionally

23    (1) because contracts cannot condone employment in violation of the law, (2) because

24    estoppel against the Commonwealth does not lie with respect to non-immigrant alien

25    contracts, (3) because the statutory scheme surrounding Title 3, Commonwealth Code,

20

1    Subsection 4434(e)(1), including the Dictionary of Occupational Titles (DOT) (4th Ed.,

2    Rev. 1991), its successor O*Net, and the ordinary definition of the words in "surface tour

3    boat operator" clearly proscribe the employment conduct engaged in by Plaintiffs, and (4)

4    because an alien's entry may be conditioned upon specific employment.

5

6    **B.  Current federal law does not preempt CNMI immigration law.**

7         The most novel of Plaintiffs' theories is that CNMI immigration law, in particular

8    the provisions reserving surface tour boat operator employment for locals (as opposed to

9    non-immigrant aliens), 3 CMC § 4434(e)(1) (2004), is preempted by U.S. Coast Guard

10   licensing authority over vessel operators and by federal jurisdiction over coastal

11   submerged lands.  Amended Complaint ¶¶ 72-75.  However, Coast Guard licensure to

12   ensure maritime safety is not inconsistent with and does not preempt CNMI employment

13   or immigration law, CNMI immigration law applies extraterritorially, federal jurisdiction

14   over the CNMI's coastal waters is not exclusive, and the CNMI has exclusive jurisdiction

15   over Internal Waters, including the Saipan Lagoon.

16

17   **1.  Maritime safety legislation does not preempt employment and immigration**

18   **law.**

19        Central to the Second Claim for Relief in the Amended Complaint is the notion that

20   U.S. Coast Guard licensure divests the CNMI of the ability to enforce its immigration and

21   alien employment laws.  The only law cited by Plaintiffs whatsoever in favor of this almost

22   unstated preemption argument is the definition of uninspected undocumented passenger

23   vessels in 46 U.S.C. § 2101(42).  Otherwise, Plaintiffs have so far made no arguments

24   whatsoever concerning preemption.

25

1    Under the unstated concept supporting the Plaintiffs' theory, because three of the
2    individual Plaintiffs have their vessel operator licenses, they should then be equally entitled
3    to go to Los Angeles and drive boats there, regardless of federal immigration law.  Of
4    course, this is not the law, and they have cited no authority for this.

5    Preemption is a vast field of law, but suffice it to say that even if Plaintiffs had made
6    a prima facie legal showing of its potential applicability, which Defendants deny, the
7    Supreme Court has cautioned that "inflexible application of [preemption] doctrine is to be
8    avoided, especially where the State has a substantial interest in regulation of the conduct at
9    issue and the State's interest is one that does not threaten undue interference with the
10   federal regulatory scheme." *Farmer v. United Bhd. of Carpenters*, 430 U.S. 290, 302
11   (1977).  Here, the enforcement of CNMI immigration law creates no interference with
12   U.S. Coast Guard maritime safety concerns.  The U.S. citizens or permanent residents
13   whom Plaintiff Auto Marine, Inc. should have hired to operate the boats are still required
14   by federal law to obtain U.S. Coast Guard licenses, and CNMI immigration law makes no
15   attempt whatsoever to contravene this.

16   Even the field of regulation of navigation and boating is not fully preempted by the
17   USCG.  To the contrary, under the cognizance of and subordinate to USCG occupation of
18   the field, the CNMI Department of Public Safety, Boating Safety Unit exercises its own
19   limited concurrent jurisdiction.  *See* 3 CMC §§ 5401-62; *see also* Part III.B.3., *infra*.

20   Yet what is at issue here are immigration statutes, the Nonresident Workers Act and
21   Alien Labor Act of 1986.  They do not become a navigation and boating statutes simply
22   because aliens are not permitted to enter the CNMI to take employment as boat captains.

23   There is no federal preemption precisely because there is no conflict with federal
24   law.  Plaintiffs have failed to cite a single Coast Guard statute that is in conflict with
25   Title 3, Commonwealth Code, Subsection 4434(e)(1).  Nor have they provided any

1  authority that a Coast Guard license would, without more, entitle them to admission to the

2  United States to work as a boat captain there.  Hence, there is indeed no conflict, and no

3  preemption.

4      **2.  The CNMI has extraterritorial immigration jurisdiction.**

5      Under federal law, the United States has extraterritorial jurisdiction to prosecute

6  immigration offenses perpetrated against the sovereignty of the United States.  *See, e.g.,*

7  *United States v. Chen*, 2 F.3d 330, 333-34 (9th Cir. 1993); *United States v. Aguilar*,

8  883 F.2d 662, 692 (9th Cir. 1989).  For instance, by its very nature "attempted illegal

9  entry" must occur outside the immigration boundaries, otherwise it would be a

10  consummated smuggling offense rather than an attempt.  The same principles apply to

11  CNMI immigration law.  As long as there is a nexus with the forum, it is not required that

12  the acts occur within the CNMI.  The Commonwealth has an interest in policing and

13  regulating the employment of non-immigrant aliens whose jobs are based in the CNMI.

14      In this case, the individual Plaintiffs entered the Commonwealth under CNMI

15  immigration law, to work at specific jobs.  They lived in the CNMI, were paid in the

16  CNMI, and employed in the CNMI, by a business established under CNMI law.  When

17  they undertook tasks prohibited by CNMI law, they took the place of someone residing in

18  the CNMI who could operate, or be trained to operate, a boat legally, and whom the

19  CNMI people through their elected lawmakers have determined should be given a priority.

20      So even to the extent the proscribed conduct took place beyond the internal waters

21  of the Commonwealth, that is, beyond the coastline and fringing reefs, outside the Saipan

22  Lagoon, Title 3, Commonwealth Code, Subsection 4434(e)(1) is fully enforceable

23  extraterritorially, due to the nexus with the CNMI.  This extraterritorial jurisdiction is even

24  stronger where there is concurrent jurisdiction, as discussed immediately below.

25

**3. The CNMI has concurrent jurisdiction over waters above federal submerged lands.**

The fact that the federal government has title to certain submerged lands surrounding the Commonwealth does not divest the CNMI of police powers in the waters above it.

For example, the Commonwealth may regulate the local fishery and fishermen to the extent of the federal exclusive economic zone. *Hughes v. Oklahoma*, 441 U.S. 322 (1979) (states' interests in conservation and protection of wild animals are legitimate local purposes similar to states' interests in protecting health and safety of their citizens, and state's interest in maintaining ecological balance in state water). The CNMI's police power to regulate the local fishery is not preempted by federal law. *Anderson Seafoods, Inc. v. Graham*, 529 F. Supp. 512 (N.D. Fla. 1982) (Congress's reservation of state authority to regulate fishing indicates it did not intend complete preemption). *See also People v. Weeren*, 26 Cal.3d 654, 163 Cal.Rptr. 255, 607 P.2d 1279 (Cal. 1980), *cert. denied*, 449 U.S. 839 (1980).

The exact boundaries of the CNMI's "internal waters" have yet to be definitively resolved by federal legislation or litigation. However, the CNMI Attorney General has determined that the internal waters of the Commonwealth encompass waters within the coastline and fringing reefs, including, inter alia, the Saipan Lagoon. *See* N.M.I. Att'y Gen. Op. 07-01 (May 8, 2007), *reprinted in* Commw. Reg. 26,517 at 26,517 to 26,522 (CNMI retains exclusive jurisdiction over internal waters) (attached as Appendix 3). The United States has not taken a contrary position, and Plaintiffs have no standing to do so.

Yet Plaintiffs seem to imply, without making any effort to explain why, that *Northern Mariana Islands v. United States*, 399 F.3d 1057 (9th Cir. 2005), somehow divests the Commonwealth of jurisdiction to enforce its immigration laws in the Saipan

1    lagoon or other internal waters of the CNMI, or even in adjacent federal waters beyond

2    the coastline and fringing reefs.[13]

3         Even if, for some reason, despite the absence of the United States as a party,

4    the Court determined that the Saipan Lagoon did not constitute Internal Waters of the

5    CNMI, but were superjacent to federal submerged lands, there would be no analytic

6    difference.

7         The Paramountcy Doctrine does not save Plaintiffs' Second Claim for Relief.

8    *See* Pls.' Opp. to Defs.' Mot. to Dismiss at 8 (D.N.M.I. filed July 2, 2007).  *Native Village*

9    *of Eyak v. Trawler Diane Marie, Inc.*, 154 F.3d 1090 (9th Cir. 1998) involved an Indian

10   tribe that contended it possessed ***exclusive rights*** over federal submerged lands.  Here the

11   CNMI contends no such thing.  As describe below, the Commonwealth claims exclusive

12   jurisdiction over its internal waters, wherever they are, which do not include water over

13   federal submerged lands.  If the CNMI is wrong about what constitutes internal waters, the

14   Commonwealth does not claim exclusive jurisdiction over that area.

15        In the example of fisheries identified above, the federal government encourages

16   concurrent local jurisdiction in the waters over its submerged lands.  Likewise, the Coast

17   Guard happily encourages states and insular areas to cooperate with the federal

18   government with regard to regulation of navigation and boating, which is done by the

19

20

21        [13]  At a pre-trial conference, the Court suggested the possibility that the CNMI
     might somehow be bound by its alleged litigating position, or its negotiating position with
22   respect to talks under Covenant Section 902, that if it couldn't get sovereignty over the
     200-mile Exclusive Economic Zone, the Commonwealth didn't want anything, including
23   the 3-mile territorial sea.  Of course, the subject of *Northern Mariana Islands v. United*
     *States* was the ***submerged lands*** below the low water mark of the coastline and fringing
24   reefs.  The ***internal waters*** inside the coastline and fringing reefs were never at issue, nor
     any other internal waters.  The Ninth Circuit was clear that the CNMI currently possesses
25   no territorial sea, which the Commonwealth naturally must accept.

1    CNMI Department of Public Safety, Boating Safety Unit. *See* 3 CMC §§ 5401-62.

2    Both are concurrent with federal jurisdiction,

3         What is at issue here is an immigration statute. It does not become a navigation and

4    boating statute simply because aliens are not permitted to enter the CNMI to take

5    employment as boat captains. The U.S. has passed no immigration laws to the contrary.

6         The CNMI retains concurrent jurisdiction to enforce its immigration laws in

7    whatever waters lie above the federal submerged lands, wherever the demarcation line

8    with Internal Waters may lie.

9    **4. The CNMI has exclusive jurisdiction over internal waters, including the**

10   **Saipan Lagoon.**

11        Whether the internal waters of the Commonwealth include that within the coastline

12   and fringing reefs (including Saipan Lagoon), the Juridicial Bays and Historic Bays (such

13   as Laulau Bay), and Inter-Island Channels (such as the Tinian Channel), *see* N.M.I. Att'y

14   Gen. Op. 07-01 (May 8, 2007), *reprinted in* Commw. Reg. 26,517, and exclude Protected

15   Harbors (such as the Saipan Roadstead where pre-positioning ships anchor), *Id.*, or are

16   limited to bodies of water such as Lake Susupe, are all of no consequence to the

17   determination of this lawsuit.

18        Whatever internal waters the Commonwealth possesses, it possesses. What it

19   doesn't, it doesn't. Notably, the United States has not contested the Commonwealth's

20   position. But whatever water the CNMI lacks exclusive jurisdiction over, it has

21   concurrent jurisdiction over. The Commonwealth also has extraterritorial immigration

22   jurisdiction, and the Plaintiffs have utterly failed to show that federal maritime safety

23   legislation is preemptive of CNMI immigration law.

24        It is undisputed that at least some of Plaintiffs' boat trips went into waters above

25   federal submerged lands, that is outside the reef, or in the Saipan Lagoon if N.M.I.

1   Attorney Opinion 07-01 is somehow shown to be flawed.  So regardless of whatever the
2   CNMI controls exclusively, the other bases for enforcing Title 3, Commonwealth Code,
3   Subsection 4434(e)(1) still need to be considered, as they have been above.

4

5   **C.  The local employment preference provision of the CNMI immigration scheme**
6   **does not violate Equal Protection.**

7       The Ninth Circuit has upheld the Nonresident Workers Act, 3 CMC §§ 4411-52, as
8   a whole.  *See Sagana v. Tenorio*, 384 F.3d 731, 741 (9th Cir. 2004).  However, the Court
9   left open the possibility that specific portions of the Act might fail constitutional muster.
10  *Id.* at 741-42 ("Our decision does not foreclose the possibility that discrete elements of the
11  CNMI's temporary worker program could violate the equal protection rights of
12  nonresident workers").  Plaintiffs argue that Title 3, Commonwealth Code, Subsection
13  4434(e)(1), is one such provision, either on its face or as applied.

14      However, the First Claim for Relief should be denied statutorily and constitutionally
15  (1) because contracts cannot condone employment in violation of the law, (2) because
16  estoppel against the Commonwealth does not lie with respect to non-immigrant alien
17  contracts, (3) because the statutory scheme surrounding Title 3, Commonwealth Code,
18  Subsection 4434(e)(1), including the Dictionary of Occupational Titles (DOT) (4th Ed.,
19  Rev. 1991), its successor O*Net, and the ordinary definition of the words in "surface tour
20  boat operator" clearly proscribe the employment conduct engaged in by Plaintiffs, and (4)
21  because an alien's entry may be conditioned upon specific employment.

22      **1.  Contracts cannot condone employment in violation of the law.**

23      It has been suggested that certain aspects of the Plaintiffs' employment contracts
24  condone the individuals' performing work as a "surface tour boat operator" in violation of
25  3 CMC § 4434(e)(1), despite their ostensible employment in other job classifications.

1   These include language in their contracts permitting them to drive boats "when

2   necessary."  However, only the contract of Benjamin I. Santos included this provision

3   before they were arrested.  *See* Defs.' Proposed Findings of Fact, ¶ 21.

4   However, interpreting this provision must take into consideration the totality of the

5   circumstances, including the local employment preference provision of Subsection

6   4434(e)(1) reserving the job of "surface tour boat operator" for U.S. citizens or other

7   non-aliens such as immediate relatives or citizens of the Freely Associated States,

8   and barring non-immigrant aliens such as the individual Plaintiffs from driving tourists in

9   boats, or taking passengers on tours.  In this context, "when necessary" could include

10  emergency absences of an employed non-alien "surface tour boat operator," or operating

11  the boat for non-tour purposes, such as mechanical maintenance.

12  Another argument is that on its face Subsection 4434(e)(1) only limits the CNMI

13  Director of Labor, not the Plaintiffs.  However, the first sentence of Section 4434

14  incorporates all subsequent subsections as conditions on the employer (Auto Marine, Inc.)

15  in the contractual relationship.  *See* Defs.' Proposed Findings of Fact, ¶ 9.  Even before

16  reaching the absolute bar to surface tour boat operator employment in Subsection (e)(1),

17  the very first subsection of the same section of the Commonwealth Code, at Subsection

18  4434(a), concludes:

19      Approval by the chief, as required by this section, is a review of the contract
        for compliance with the provisions of this chapter.  Such review shall not
20      subject the chief or the Commonwealth government to liability on the
        employment contract, even if the chief approves a contract which does not
21      comply with all the provision [sic] of this chapter.

22  3 CMC § 4434(a); Alien Labor Act of 1986, Pub. L. 5-32, § 8(a).

23  Also, a few sections later, employees are barred from employment except

24  ***pursuant to*** an approved contract, 3 CMC § 4437(d) (emphasis added); and unlawful

25  employment by an employer is a felony, 3 CMC § 4361(e), and by an employee a

28

1    misdemeanor or cause for deportation.  3 CMC § 4361(f).  *See generally Commonwealth*

2    *v. Francisco*, Crim. No. 99-0055 (N.M.I. Super. Ct. Dec. 14, 1999) (attached to

3    Defendants' First Trial Memorandum [Brief] (D.N.M.I. filed Sep. 10, 2007)).[14]

4           When contracts are submitted to the Director of Labor, that does not mean approval

5    of every expansive interpretation of what employment the contract might be deemed to

6    cover, particularly if in violation of law.  For instance, a provision to "eliminate

7    competitors as necessary" would not be a governmental endorsement of death squads.

8    The terms of the contract bind the relationship between employer and employee.  What

9    review occurs by the staff of the Director of Labor is to ensure compliance with

10   the Nonresident Workers Act, *see* 3 CMC § 4434(a), not to create a game of "gotcha"

11   if some impermissible terms or a creative interpretation in favor of the contracting parties

12   and against the government are slipped in and overlooked.

13        **2.  Estoppel against the Commonwealth does not lie with respect to**

14   **non-immigrant alien contracts.**

15          The intent of the CNMI government not to be bound by exactly such contract

16   approvals as these is not only expressly set forth in CMC § 4434(a) it is the subject of

17   more general case law with respect to estoppel against the government.

18          Estoppel is an equitable doctrine invoked to avoid injustice in particular cases but

19   rarely applied against the government.  In the leading case of  *Heckler v. Community*

20   *Health Services of Crawford County, Inc.*, 467 U.S. 51 (1984), the Court refused to

21   invoke estoppel against the government so as to prevent recoupment of an overpayment

22

23          [14]  The deportation cases against Plaintiffs Rolando E.A. Senoran, Benjamin I.
     Santos, Normandy I. Santos, and Agusto I. Santos, Amended Complaint ¶ 53, have been
24   dismissed pursuant to the settlement of the Third through Sixth Causes of Action.
     The prosecution of Auto Marine President Adonis Santos, *see* Amended Complaint ¶¶ 54-
25   55, has been stayed pending resolution of this case.

1  made to a health care provider who had relied on oral representations by an official that

2  certain costs were reimbursable.  The Court stated: "When the Government is unable to

3  enforce the law because the conduct of its agents has given rise to an estoppel, the interest

4  of the citizenry as a whole in obedience to the rule of law is undermined.  It is for this

5  reason that it is well established that the Government may not be estopped on the same

6  terms as any other litigant."  467 U.S. at 60.

7        This doctrine has also been adopted as a matter of CNMI law.  In *Rasa v.*

8  *Department of Lands and Resources, Division of Public Lands*, 1998 MP 7, 5 N.M.I. 162,

9  the CNMI Supreme Court rejected a claim for specific performance of a land exchange

10  agreement previously made by Commonwealth officials and former Governor Guerrero.

11  The Department of Public Lands and the Department of Public Works both indicated that

12  there was no public purpose justifying the acquisition of the Rasa property. 1998 MP 7,

13  ¶8.  "Estoppel is available when the actions of the government or its representative rise to

14  a level of 'affirmative misconduct' and will not be invoked where it would defeat

15  operation of policy adopted to protect the public.  Estoppel is rarely invoked for the

16  negligence or omissions of a public official, unless the party seeking estoppel establishes

17  affirmative misconduct beyond mere negligence." *Id*. at ¶11.

18        In addition to requiring a showing of affirmative misconduct, the Ninth Circuit has

19  held that "even then, estoppel will only apply when the government's wrongful act will

20  cause a serious injustice, and the public's interest will not suffer undue damage by

21  imposition of the liability." *Watkins v. U. S. Army*, 875 F.2d 699, 707 (9th Cir.1989).

22        This general rule is a well recognized one of long standing.  In *Utah Power & Light*

23  *Co. v. United States*, 243 U.S.389 (1917), the Supreme Court rejected the power

24  company's claim that the federal government was estopped from questioning the

25  company's right to use public land in forest reservations as sites for generating electric

1    power.  To the extent that the company contended that its construction and operations of

2    facilities were based on understandings and agreements with federal officials, the Court

3    held that "the United States is neither bound nor estopped by acts of its officers or agents

4    in entering into an arrangement or agreement to do or cause to be done what the law does

5    not sanction or permit."  243 U.S. at 409.  To the argument that the company's activities

6    had been known to government officials and "impliedly acquiesced therein," the Supreme

7    Court responded: "This ground also must fail.  As a general rule, laches or neglect of duty

8    on the part of officers of the government is no defense to a suit by it to enforce a public

9    right or protect a public interest."  *Id*.

10        In a more recent case, a federal district court confirmed the right of federal officials

11   to enforce a regulation issued by the National Park Service after many years of non-

12   enforcement.  *Washington Tour Guides Association v. National Park Service*, 808 F.

13   Supp. 877 (D.D.C. 1992).  The court held that the operators of tourist services in

14   Washington D.C. did not have a constitutionally protected right to solicit business on

15   National Park Service grounds in violation of regulations outlawing that activity, even

16   though they may have been allowed to do so for a number of years.  Relying on the *Utah*

17   *Power & Light Company* decision, the court held that the doctrine of equitable estoppel is

18   inapplicable even if the Park officials made the representations claimed by the plaintiffs:

19   "Simply put, the government may not be estopped from enforcing the law, even following

20   an extended period of no enforcement or underenforcement."  808 F. Supp. at 882.

21   Quoting from an earlier decision, the court stated: "An administrative agency charged with

22   protecting the public interest is not precluded from taking appropriate action nor can the

23   principles of equitable estoppel be applied to deprive the public of the statute's protection

24   because of mistaken action or lack of action on the part of public officials."  *Id.*

25

1    The same result has been reached in numerous other decisions covering a variety of

2    government activities. *Bennett v. Gray's Harbor County*, 15 Wash. 2d 331, 346, 130 P.2d

3    1041, 1045 (1942) (In a quiet title action against the County the court applied "the

4    generally accepted rule that the public, whether exercising its functions though a state or

5    through a county, city, town, or other governmental agency or instrumentality, cannot be

6    estopped by unauthorized, illegal, or fraudulent acts or statements on the part of their

7    officers and agents, even though benefits to the public have accrued and been accepted.");

8    *National Labor Relations Board v. Baltimore Transit Co.*, 140 F.2d 51, 55 (4th Cir.), *cert.*

9    *denied*, 64 S. Ct. 847 (1944) (In enforcing the NLRB order the court stated that "the

10   principles of equitable estoppel cannot be applied to deprive the public of the protection of

11   a statute because of mistaken action or lack of action on the part of public officials.");

12   *McComb v. Homeowners Handicraft Cooperative*, 176 F.2d 633, 641 (4th Cir. 1949)

13   (The court affirmed the government enforcement action notwithstanding the defendant's

14   alleged reliance on rulings by tax officials and the delay in instituting the proceedings on

15   the grounds that laches and estoppel "may not be relied upon 'to deprive the public of the

16   protection of a statute because of mistaken action or lack of action on the part of public

17   officials.'"); *Goodwill Industries of Southern California v. Los Angeles County*, 117 Cal.

18   App. 2d 19, 27, 254 P.2d 877, 882 (1953) (An erroneous approval of corporate papers by

19   county assessor did not estop city and county from recovering taxes because estoppel

20   "may not be invoked where its application would tend to thwart public policy."); *United*

21   *States v. Ruby Company*, 588 F.2d 697 (9th Cir. 1978), *cert.denied*, 442 U.S. 917 (1979)

22   (In approving the Government's reliance on a 1957 survey rather than a 1876 survey the

23   court held (1) that there was no affirmative misconduct by Government officials that might

24   permit application of estoppel; (2) that public lands are held in trust by the Federal

25   Government for all the people; and (3) that the doctrine of laches is not available against

1  the Government in a suit by it to enforce a public right or a public interest."); *Vestrup v.*
2  *Du Page County Election Commission*, 335 Ill. App. 3d 156, 166, 779 N.E.2d 376, 384
3  (2002) (Notwithstanding candidate's reliance on advice of State Board of Elections, the
4  court held that the county's electoral board was not estopped from challenging candidate's
5  nomination applying the general rule that "[e]stoppel is applied against the state only to
6  prevent fraud and injustice."); *New Trier Mortgage Corp. v. U.S. Dept. of Housing and*
7  *Urban Development*, 252 F. Supp. 2d 446, 456 (N.D.OH 2002) (The court enforced a
8  HUD disciplinary action despite inadvertence by agency officials in reviewing the matter,
9  in reliance on rule that "[o]rdinarily the acts of individual officers and agents do not give
10 rise to estoppel."); *Del Gallo v. Secretary of the Commonwealth*, 442 Mass. 1032, 816
11 N.E.2d 108, 111 (2004) (Although local election officials provided erroneous advice to
12 prospective candidate, the court refused to estop officials from enforcing the law, relying
13 on the general rule that "the doctrine of estoppel is not applied against the government in
14 the exercise of its public duties or against the enforcement of a statute."); *S.R. Products v.*
15 *Gerrity*, 156 Ohio App.3d 150, 156, 805 N.E.2d 108, 111 (2004) (A Fire Department's
16 failure to implement regulation earlier did not bar enforcement of the law because the
17 "doctrine of equitable estoppel does not apply against a state or its agencies in the exercise
18 of a governmental function.").

19 **3. The statutory scheme surrounding Title 3, Commonwealth Code,**
20 **Subsection 4434(e)(1) and the ordinary definition of the words in "surface tour boat**
21 **operator" clearly proscribe the employment conduct engaged in by Plaintiffs.**

22 Plaintiffs have argued that they do not know what a "surface tour boat operator"
23 means, and that there is no such entry in the Dictionary of Occupational Titles (DOT) (4th
24 Ed., Rev. 1991) or in O*Net.  *See* Defs.' Proposed Findings of Fact, ¶ 6.  However, the
25 DOT does have a job classification for Sightseeing-Boat Operator (water trans.), and the

33

O*Net has position descriptions for Motorboat Operators, Ship and Boat Captains, and Mates – Ship, Boat, and Barge.  *See* Defs.' Proposed Findings of Fact, ¶ 7.

The Legislature knew that the DOT was already on its 4th Edition and would be subject to change; the CNMI Division of Labor has since continued its updating of its labor system in harmony with federal law by its subsequent proposed regulations adopting the position descriptions (instead of job classifications) of O*Net.  *See* Defs.' Proposed Findings of Fact, ¶ 54.

The Plaintiffs' argument that the lack of a DOT job classifications required by 3 CMC § 4412(j) is fatally defective to the validity of Subsection 4434(e)(1) has two flaws.

First is that this job classification requirement and the prohibition against non-immigrant aliens working as "surface tour boat operators" were created in the very same law, the Alien Labor Act of 1986, N.M.I. Pub. L. 5-32, §§ 3(b) & 8(e) (attached as Appendix 1).  *See* Defs.' Proposed Findings of Fact, ¶¶ 2 & 8.  Hence, the Legislature must not have meant the prohibition to have been limited by the lack of a DOT job classification definition.

Second, even the Plaintiffs' own contracts have job classifications not listed by DOT, namely Diving Manager, Maintenance Mechanic, and Helper Mechanic, which would then invalidate the lawfulness of their employment.  As described above, however, there are similar DOT and O*Net listings for the latter two, albeit with a different name, as there are with Surface Tour Boat Operator.  *Compare* Defs.' Proposed Findings of Fact, ¶¶ 29, 34, & 38 *with* ¶ 7.

During oral argument on Defendants' MTD, Plaintiff introduced arguments about international cruise ships piloted by alien captains being subject solely to U.S. Coast Guard regulation.  Defendants countered that these were ships, not boats.  Also, there are

1  separate provisions dealing with vessel and aircraft crew entering the Commonwealth.

2  *See, e.g.,* 3 CMC § 4321(e).  The case at bar involves persons admitted to the CNMI

3  admitted as permanent employees under the Nonresident Workers Act, 3 CMC

4  §§ 4411-52, not alien crew members on brief sojourns.

5  Similar arguments could be made about the commercial fishing vessels that formerly

6  landed at Tinian several decades ago being permitted entry solely by virtue of the

7  U.S.C.G., though there is no gainsaying that the crew of such voyages were fishermen

8  rather than tourists, and likewise covered by CNMI immigration law with respect to crew

9  members.

10  Plaintiffs and Defendants have stipulated that the Saipan-Tinian ferry has been

11  operated by aliens.  The relevance of such evidence, however, is lacking, because such

12  ferry voyages constitute point-to-point passenger and cargo transportation rather than the

13  operation of a "surface tour boat."

14  In contrast to the surface tour boat operations to Mañagaha, where all or almost all

15  trips are sold on a round-trip basis, the Tinian ferry sells one-way tickets, and there are

16  other modes of return travel, such as by air.

17  This leads to the key word in the definition of a "surface tour boat operator,"

18  the word "tour."  Merriam-Webster's Online Dictionary defines the word in relevant part

19  as follows:

20  Etymology: Middle English, from Anglo-French tur, tourn turning, circuit,
    journey — more at TURN

21

22  2a:  a journey for business, pleasure, or education often involving a series of
    stops and ending at the starting point; also: something resembling such a tour
    <a tour of the history of philosophy> b: a brief turn: ROUND c: a series of

23  professional tournaments (as in golf or tennis)

24  http://www.m-w.com/dictionary/tour (visited Sep. 10, 2007).

25

35

1    Plaintiffs' counsel has stated that the business of Auto Marine, Inc. includes, but is

2    not limited to, of taking paying passengers on boat trips for (1) fishing, (2) scuba diving,

3    (3) banana boat rides, and (4) voyages between Saipan and Mañagaha Island.  None of

4    these seem to be mere transportation, and all but the banana boat rides fall well within

5    the definition of "tour" set forth above.  All four of these surface boat operations involve

6    the paying passengers' "journey for pleasure," or perhaps education.

7    A fishing tour includes "a series of stops" or drifts, ultimately "ending at the starting

8    point."  Certainly the catching of fish is the most important consideration, but not the only

9    one.  The paying passengers are going for the pleasure of fishing, to be guided in safety by

10   those with knowledge of good fishing spots.  Auto Marine, Inc. does not have a

11   commercial fishing business license.  Were obtaining fish the sole requirement, cliff fishing

12   or a trip to the fish market would suffice.

13   A scuba tour likewise ends at the starting point, either on the boat, or perhaps after

14   swimming through the reef to shore with the tour ending via ground transportation.

15   Auto Marine, Inc. operates vans to bring tourists to its boats.  The dive itself is

16   unquestionably a tour, though that is not on a surface boat.  *See* 3 CMC §§ 5601-11.

17   Yet two definitions in that context provide further insight.

18       "'Scuba diving tour' means to accompany scuba divers underwater as a guide
         ***for gain***."

19

20       "'Tour leader' means that person employed by a business to dive with
         customers and guide them underwater who is assigned by the business the
         duty of overall supervision of a dive and the ***primary responsibility for the***

21       ***safety of customers***.  The tour leader may be assisted by one or more
         employees in guiding customers on a dive; however, none of these guides

22       shall be considered a tour leader."

23   3 CMC § 5603(c) & (e) (emphasis added).  The fact that there are paying passengers is

24   a factor in determining whether there is a tour, as are the duties of a surface tour boat

25   operator for passenger safety, though these factors also exist in mere transportation.

36

1   What distinguishes the surface tour boat operation with respect to fishing tours and scuba

2   diving tours is that the boat rides are not simply modes of movement, but an inseparable

3   part of the "journey for business, pleasure, or education often involving a series of stops

4   and ending at the starting point."

5        The banana boat ride is a closer question.  Here, the passengers are not on the boat;

6   rather, a floating raft ("banana boat") is towed behind the boat.  Hence it could be deemed

7   closer to a thrill ride than a tour, in the nature of skydiving, hang gliding, parasailing (in the

8   air behind a boat), water skiing, or jet skiing.  Yes, there is still a "journey for . . . pleasure

9   . . . ending at the starting point."  However, the "tour" is not conducted aboard a "surface

10  tour boat."[15]

11       Finally, there is the issue of whether voyages between Saipan and Mañagaha Island

12  constitute a "tour," or simply basic point-to-point transportation.  As with boat dives and

13  fishing trips, the ride on the boat is an essential part of the experience.  As stated above,

14  the round-trip nature of trips to Mañagaha, and also the lack of overnight accommodations,

15  all demonstrate that these voyages fall within the definition of a pleasure tour.  Indeed,

16  they are the archetypical tourists.  *See* 2 CMC § 1621 note ("The imposition of a landing

17  fee paid by ***tourists*** disembarking Managaha Island") (emphasis added), *but see* 2 CMC

18  § 1621 ("Each commercial carrier engaged in the transport of passengers to Managaha

19

20       [15]  Accordingly, for purposes of this case, Defendants withdraw the contention made
    at oral argument on 12 July 2007 that operating a boat towing a banana boat constitutes
21  employment as a "surface tour boat operator" under the current version of 3 CMC
    § 4434(e)(1).  The new regulations, if adopted, will bar such activity by limiting all boat
22  operations to non-aliens.  Similarly, a submarine sightseeing tour in the Saipan lagoon is
    not done on the surface and would not be barred by the current state of the law.
23
         Of course, if any of the other three operations conducted by Plaintiffs — fishing
24  boat tours, scuba boat dives, or tours to Mañagaha Island — are found by the Court to fall
    within the definition of "tour boat operations," then the Plaintiffs will be unable to claim
25  they are not violating the statute, in the absence of estoppel or other legal excuse.

Island").  It would be stretching the plain meaning of words to hold that our visitors' day

tours to Mañagaha Island begin on the island, where many just lie on the beach, rather than

at Smiling Cove or the Outer Cove Marina.

### 4. An alien's entry may be conditioned upon specific employment.

At the heart of this dispute is an immigration provision, Title 3, Commonwealth

Code, Subsection 4434(e)(1), prohibiting non-immigrant aliens from moving to the CNMI

to take certain jobs set aside for U.S. citizens and immigrant aliens (permanent residents),

including work as a surface tour boat operator or commercial vehicle operator.

The challenge raised in the First Claim for Relief is based on the Equal Protection

Clause of the Fourteenth Amendment.  *See* Amended Complaint ¶¶ 64-69.  Plaintiffs assert

that the prohibition against non-immigrant aliens working as surface tour boat operators

and commercial vehicle operators violates Equal Protection by restricting employment

solely on the basis of alienage.  Amended Complaint ¶ 65.  They argue that there is no

rational basis for this prohibition, that it "does not serve any compelling governmental

reason, is not substantially related to any important governmental objective and does not

have any rational relationship to any legitimate governmental objective."  Amended

Complaint ¶ 66.  Plaintiffs allege that Subsection 4434(e)(1) is invalid on its face and as

applied.  Amended Complaint ¶¶ 67-68.

"[O]ver no conceivable subject is the legislative power of Congress more complete

than it is over" the admission of aliens.  *Oceanic Steam Navigation Co. v. Stranahan*, 214

U.S. 320, 339 (1909) (upholding civil fine for transporting immigrants with contagious

disease).  While the CNMI does not have the full panoply of powers related to foreign

affairs and national defense, this Court has recognized the important governmental

interests at stake in deciding who may enter the CNMI and what they can do once they

arrive.

The Nonresident Workers Act, 4 CMC §§ 4411-52, as with deportation of overstaying tourists or visitors, is "substantially related to important CNMI governmental interests in controlling immigration to preserve the local culture and maintaining economic opportunity for indigenous residents while at the same time promoting tourism, a mainstay of the local economy." *Tran v. Northern Mariana Islands*, 780 F.Supp. 709, 714 (D.N.M.I. 1991) (deportee has no right to work in NMI), *aff'd*, 933 F.2d 884 (9th Cir. 1993) (mem). In fact, the very first sentence of the Act sets forth the policy reasons for its enactment, which clearly apply to reserving jobs as a surface tour boat operator or commercial vehicle operator for U.S. citizens and permanent residents. "The legislature finds and declares that it is essential to a balanced and stable economy in the Commonwealth that residents be given preference in employment and that any necessary employment of nonresident workers in the Commonwealth not impair the wages and working conditions of resident workers." 4 CMC § 4411(a). This constitutes the rational basis, or important state interest, for Subsection 4434(e)(1).

And of course employment-based visas are common in the federal immigration system under Title 8 of the U.S. Code, such as the H-1 and H-2 visa, where the immigrant is limited to a particular employment such as nurse. If there is no Equal Protection violation in conditioning entry upon employment in a certain category, perforce there is no violation in limiting these non-immigrants to all but a narrow class of jobs that have been reserved for U.S. citizens and permanent residents, "to preserve the local culture and maintain[ ] economic opportunity for indigenous residents while at the same time promoting tourism, a mainstay of the local economy." *Tran* at 714.

At this late date, the power of the CNMI to condition entry upon certain limitations on permissible employment is well established, so a constitutional challenge on to the protectionist nature of the statute on its face does not lie.

1       There are three standards of scrutiny that theoretically could be applied in analyzing

2   the constitutionality of immigration laws based upon alienage.  Deferential scrutiny applies

3   the rational basis test.  Intermediate scrutiny applies an important state interest

4   examination, and is used for gender.  Strict scrutiny requires a compelling state interest.

5   Whether the rational basis test or intermediate scrutiny applies to CNMI immigration laws

6   remains an open question, both in the District and in the Circuit.  *Tran v. Northern*

7   *Mariana Islands*, 780 F.Supp. 709, 713-14 (D.N.M.I. 1991); *Yang v. Amer. Int'l Knitters*

8   *Corp.*, 789 F.Supp. 1074, 1078 (D.N.M.I. 1992); *Sagana v. Tenorio*, 384 F.3d 731, 740-

9   42 (9th Cir. 2004).  *See also* Pls.' Opp. to Defs.' Mot. to Dismiss at 4-5 (D.N.M.I. filed

10   July 2, 2007).

11       *Sirilan v. Castro*, 1 C.R. 1082, 1118-19, 1125, 1130 (D.N.M.I. App. Div. 1984),

12   relied upon by Plaintiffs in their Opposition to Defendants' unsuccessful Motion to

13   Dismiss, applied CNMI immigration laws to intermediate scrutiny under the ***CNMI***

14   Constitution, not the federal one.  *Id.  Chun Nam Kin v. Northern Mariana Islands,* 3 C.R.

15   608, 612, 1989 WL 311391 (D.N.M.I. 1989) was cited but not followed in *Tran* and

16   *Yang*.

17       One thing is clear, however, and that is that strict scrutiny does not apply.

18   The Ninth Circuit's "holding that the NWA as a whole passes both rational basis review

19   and intermediate scrutiny" *Sagana*, 384 F.3d at 741, necessarily means that strict scrutiny

20   is absolutely not warranted.  The argument that the CNMI is to be treated as a state

21   provides no assistance, because not one of the fifty states controls its own immigration.

22   Therefore, there is not a single case interpreting the standard of scrutiny to be applied to

23   state immigration laws.  Cases interpreting whether a state ***as an employer*** may

24   discriminate against aliens lawfully admitted by the federal government, Pls.' Opp. to

25   Defs.' Mot. to Dismiss at 6-7 (D.N.M.I. filed July 2, 2007), are not on point for analyzing

the degree to which a state in control of its own immigration may limit such immigration to specific job categories, as the federal government does in some cases with those persons it deems fit to admit.

As with the *Tran*, *Yang*, and *Sagana* cases, whether intermediate scrutiny or the rational basis test applies is not dispositive, but the rational basis test should be used for the reasons set forth in *Tran* and *Yang*.

Plaintiffs have found no principled reason that the local preference for surface tour boat operators should fall within an exception not ruled out by *Sagana*.

## IV.  CONCLUSION

For the foregoing reasons, the first to Claims for Relief should be denied.

Respectfully submitted,

OFFICE  OF  THE  ATTORNEY  GENERAL

MATTHEW  T.  GREGORY  # F0205
Attorney General

Dated:  Monday, 24 September 2007.

GREGORY  BAKA  # F0199
Deputy Attorney General

Attorneys for Defendants

Appendices:

1.  N.M.I. Pub. L. 5-32 (Apr. 29, 1987).

2.  Proposed Amend'ts to Alien Labor Rules & Regulations, Commw. Reg. 26,785-95 (Sep. 17, 2007).

3.  N.M.I. Att'y Gen. Op. 07-01 (May 8, 2007), *reprinted in* Commw. Reg. 26,517-27.

n:\ . . . \gbaka\civil\immigration\Auto Marine v. Lizama\Defs'.proposed.findings.of.fact.&.conclusions.of.law.pld.wpd

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(d), the undersigned declarant states as follows:

1.    I am eighteen years of age or older, and I certify that I caused to be served the following

documents to the last known address(es) listed below on the date(s) indicated.

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW; CERTIFICATE OF SERVICE**

2.    As set forth below, this service was accomplished by personal delivery; U.S. Mail; deposit with

Clerk of Court (in attorney box), cf. Fed. R. Civ. P. 5(b)(2)(D); or electronic service, see Local Rule 5.1.

| | |
|---|---|
| G. Anthony Long, Esq.  # F0162 | Attorney for Plaintiffs |
| Beach Road, Oleai | Tel:  (670) 235-4802 |
| P. O. Box 504970 | Fax:  (670) 235-4801 |
| Saipan, MP  96950-4970 | E-mail:  logalaw@gmail.com, gal@nmilaw.com |
| | **Via Electronic Service** |

3.    I declare under penalty of perjury that the foregoing is true and correct.  Executed on

Monday, 24 September 2007.

_Gregory Baka_
_____
Deputy Attorney General
Attorney for Defendants

42